**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**RYAN L. BROWN,**

                                  **Plaintiff,**

    **vs.**                                                        **3:21-CV-1186**
                                                                 **(MAD/TWD)**

**VILLAGE OF ENDICOTT, MICHAEL MCEWAN,**
**BROOME COUNTY, STEPHANIE MILKS,**
**MICHAEL KORCHAK, STEPHEN CORNWELL,**
**DAVID HARDER, and SEAN POMEROY,**

_____

                                  **Defendants.**
_____

**APPEARANCES:**                                    **OF COUNSEL:**

**KOKOSA LAW FIRM, P.C.**                    **MARC C. KOKOSA, ESQ.**
240 Washington Avenue Extension
Suite 504
Albany, New York 12203
Attorney for Plaintiff

**KENNEY SHELTON LIPTAK**                **SHANNON T. O'CONNOR, ESQ.**
**NOWAK LLP**
233 Franklin Street - Suite 2
Buffalo, New York 14202
Attorney for Defendant Village of Endicott
and Michael McEwan

**BROOME COUNTY**                              **JOSHUA T. TERRELL, ESQ.**
**ATTORNEY'S OFFICE**                          **ROBERT G. BEHNKE, ESQ.**
Broome County Office Building
60 Hawley Street
P.O. Box 1766
Binghamton, New York 13902
Attorneys for Defendants Broome County,
Stephanie Milks, Michael Korchak,
Stephanie Cornwell, David Harder, and
Sean Pomeroy

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

On October 29, 2021, Plaintiff initiated this action by filing a complaint pursuant to 42 U.S.C. §§ 1983 and 1988 alleging violations of his constitutional rights by Defendants Village of Endicott (the "Village"), and Endicott Police Department Detective Michael McEwan (collectively, where appropriate, the "Endicott Defendants"); and Broome County, Assistant Broome County District Attorney Stephanie Milks, Broome County District Attorney Michael Korchak, Broome County District Attorney Stephen Cornwell, Broome County Sheriff David Harder, and Broome County Sheriff Sean Pomeroy (collectively, where appropriate, the "Broome County Defendants"). *See* Dkt. No. 1. Plaintiff's allegations stem from his arrest, prosecution, and imprisonment, all of which he contends "occurred through brazen intentional conduct by Defendants who were indifferent to the actual innocence of " Plaintiff. *Id.* at 2.

Presently before the Court is the Endicott Defendants' motion for summary judgment, *see* Dkt. No. 85, the Broome County Defendants' motion for summary judgment and motion to dismiss, *see* Dkt. No. 94, Plaintiff's responses in opposition, *see* Dkt. Nos. 107, 108, and Defendants' replies. *See* Dkt. Nos. 113, 114.

For the following reasons the motions are granted in part and denied in part.

### II. BACKGROUND

All parties submitted statements of material facts, responses, and replies in accordance with Local Rule 56.1. *See* Dkt. Nos. 85-35, 94-31, 106, 107-2, 113-4, 114-1. The Endicott Defendants' statement of material facts is more detailed than the statement submitted by the Broome County Defendants. *See* Dkt. Nos. 85-35, 106. As such, the Court will rely on the Endicott Defendants' reply to its own statement of material facts which contains detailed factual

allegations, Plaintiff's response, and the Endicott Defendants' reply.  *See* Dkt. No. 114-1.  The

Court will note where there are specific differences in the facts or issues raised by the Broome

County Defendants.  The Court will likewise set forth Plaintiff's specific objections to either set of

Defendants' facts throughout its recitation of the factual background.

Plaintiff lived with his mother in Waverly, New York, intermittently between 2008 and

2010.  *See* Dkt. No. 114-1 at ¶ 1.  Between 2009 and 2010, Plaintiff also lived intermittently with

his ex-fiancé Amber Chilson in Sayre, Pennsylvania.  *See id.* at ¶ 2.  Between 2010 and March

2012, Plaintiff lived with Ms. Chilson in Ulster, Pennsylvania.  *See id.* at ¶ 3.  Between March

and July 2012, he lived with Ms. Chilson and her aunt and uncle in Brackney, Pennsylvania.  *See

id.* at ¶ 4.  From July to November 2012, Plaintiff lived and/or worked in Vestal, New York.  *See

id.* at ¶ 5.  Between October or November 2012 and March or April 2013, Plaintiff lived in

Florida.  *See id.* at ¶ 6.  Plaintiff moved back to New York in March or April of 2013.  *See id.* at ¶

7.

In April of 2013, Plaintiff met Catherin Salamida through an online dating website, and

they began a relationship.  *See id.* at ¶¶ 8-9.  Ms. Salamida has three children.  *See id.* at ¶ 10.  In

May 2013, Plaintiff moved in with Ms. Salamida and two of her children, who were 13 and 6

years old at the time.  *See id.* at ¶¶ 12-14.  Throughout this Memorandum-Decision and Order, the

children will be referred to by their initials, R.O. and K.S., respectively.  *See id.* at ¶ 14.  Ms.

Salamida's eldest daughter, Nadine Jones, was 25 years old at that time.  *See id.* at ¶ 11.  Plaintiff

moved into the apartment where Ms. Salamida and her two minor children lived, which was

located at 316 Odell Avenue in Endicott, New York.  *See id.* at ¶¶ 269, 271.  Around May 1,

2023, Plaintiff, Ms. Salamida, and the two children moved to a new apartment at 401 East

Franklin Street, Endicott, New York.  *See id.* at ¶ 15.  K.S. was approximately seven years old or

in first or second grade when they moved to the new apartment. *See id.* at ¶ 272. The East Franklin Street apartment had two bedrooms and a basement. *See id.* at ¶ 16. Plaintiff and Ms. Salamida slept in the basement of the apartment, while R.O. and K.S. slept in the two first-floor bedrooms. *See id*. at ¶¶ 17-18.

On July 4, 2013, Ms. Salamida's eldest daughter, Nadine, called the police because R.O. saw Plaintiff and Ms. Salamida arguing. *See id.* at ¶ 19. R.O. told police that Plaintiff pushed Ms. Salamida into a coffee table that K.S. was lying next to. *See id.* at ¶ 20. More specifically, R.O. heard a crash and saw K.S. only three feet from Ms. Salamida. *See id.* Ms. Salamida informed the police that Plaintiff "may have pushed by her during the argument causing her to fall into the coffee table." *Id.* at ¶ 24 (quotation marks omitted). She agreed that K.S. was lying next to the coffee table. *See id.* at ¶ 25. The coffee table's wooden frame was broken. *See id.* at ¶ 26. The police arrested Plaintiff. *See id.* at ¶ 23. In later testimony, R.O. stated that Plaintiff came up the stairs from the basement and swung the door open, which accidentally hit Ms. Salamida. *See id.* at ¶ 352.

Plaintiff was arraigned in Endicott Village Court in July 2013. *See id.* at ¶ 27. He was charged with Endangering the Welfare of a Child. *See id.* Following a jury trial, Plaintiff was convicted of Acting in a Manner Injurious to a Child Less than 17, which is a Class A Misdemeanor. *See id.* at ¶ 28.

Plaintiff moved back in with Ms. Salamida and her two minor children in the beginning of 2014. *See id.* at ¶ 29. The Endicott Defendants contend that Plaintiff lived primarily with Ms. Salamida and her two children in Endicott, New York, between 2014 and 2017. *See id.* at ¶¶ 30-31. Plaintiff avers he lived with them "on and off until 2017 when [he] moved to Tennessee," because he lived with his father during some "summers." *Id.* at ¶ 30. As the Endicott Defendants

state, Plaintiff does not provide another primary living address for 2014 to 2017. *See id.* Plaintiff stated during his deposition that he lived with his father from late spring 2014 to August 2014, and late spring 2015 to August 2015. *See* Dkt. No. 85-14 at 60-62. Plaintiff also stayed with his mother intermittently around January 2015. *See* Dkt. No. 114-1 at ¶ 36. He then obtained a job in Tennessee in 2017 and used Ms. Salamida's car to move his things. *See id.* at ¶¶ 33-34. Plaintiff and Ms. Salamida ended their relationship in December 2017. *See id.* at ¶ 39.

Ms. Salamida died on May 22, 2018, after experiencing multiple organ failure. *See id.* at ¶ 41. As a result, K.S. was placed in the custody of Ms. Salamida's half-brother Dominic Salamida and his wife Kathy. *See id.* at ¶¶ 42-43. K.S. moved in with Kathy and Dominic in July 2018, in Pensacola, Florida. *See id.* at ¶ 44.

On September 24, 2018, Broome County Department of Social Services ("DSS"), Child Protective Services ("CPS") received a call reporting suspected sexual abuse of a minor. *See id.* at ¶ 45. CPS wrote a "call narrative" detailing the contents of the phone call. *Id.* at ¶ 46. The narrative states as follows:

> Sometime between 2015-2017, [K.S.] (12 [years old]) was sexually abused by the parent substitute (Ryan). The parent substitute would expose himself to [K.S.] and make suggestions regarding her performing oral sex and he would go into her room proposition her to have sex. On one occasion he rubbed a vibrating dildo on [K.S.]'s body. The mother (Cathy) has an unknown role.
>
> The source gained custody of [K.S.] in July 2018, [and K.S.] made the above disclosure to the source. [K.S.] said the parent substitute would tell her "you can use this as a pacifier anytime" referring to his penis when he exposed it to her. He came in her room and showed her a condom and said "Let [sic] play a game. If that doesn't work you can get pregnant."

*Id.* at ¶¶ 47-48 (emphasis omitted). CPS reported the information to the New York State Child Abuse and Maltreatment Register, which it was required to do by law. *See id.* at ¶¶ 49-50. CPS

created a case number and assigned the case to Senior Caseworker Peter Ames. *See id.* at ¶¶ 51-52. Ames indicated that he would contact Dominic Salamida in Florida to "see what is going on." *Id.* at ¶ 53. Ames determined that he would also "contact [Endicott Police Department] and let them know about the report/allegations and see how they want to proceed." *Id.* at ¶ 54.

Ames contacted Defendant McEwan at the Endicott Police Department on September 25, 2018. *See id.* at ¶ 55. Ames told McEwan that K.S. used to live in Endicott, New York, and that she told her aunt and uncle that her mother's boyfriend sexually abused her for years. *See id.* at ¶¶ 56-57. McEwan responded that he would need to speak with his supervisor to determine "what they will be doing if anything with this case." *Id.* at ¶ 58. McEwan briefed his supervisor about the case that same day. *See id.* at ¶ 59. McEwan also created a report, detailing the information. *See id.* at ¶ 60. Also on September 25, 2018, Ames spoke with K.S.'s uncle who reported "that the dates of abuse that were originally provided were incorrect and that the abuse started when K.S. was five years old (2011)." *Id.* at ¶ 386; *see also* Sealed Dkt. No. 117 at 153.

CPS conducted a "review of history" related to Ms. Salamida, Plaintiff, and K.S., which revealed two "indicated" CPS reports. Sealed Dkt. No. 117 at 152. "An 'indicated report' means a report made pursuant to this title if an investigation . . . determines that some credible evidence of the alleged abuse or maltreatment exists." N.Y. Soc. Serv. Law § 412(7). "An 'unfounded report' means *any* report made pursuant to this title *unless* an investigation . . . determines that some credible evidence of the alleged abuse or maltreatment exists." *Id.* § 412(6) (emphasis added).

First, there was an "indicated" CPS report against Plaintiff because he "became intoxicated and started a fight with [Ms. Salamida] while the children were present" and he "was charged with endangering the welfare." Sealed Dkt. No. 117 at 152. Second, there was an "indicated" report against K.S.'s biological father, Kevin Rozzell, from October of 2015 because "when [he]

drank he became mean and fought with [Ms. Salamida]. [Ms. Salamida] stated that [Mr. Rozelle] has an issue with drugs and alcohol and when he is using[,] he is violent and physically aggressive." *Id.* CPS did not know where Mr. Rozelle was living at the time and was, therefore, unable to interview him. *See id.* CPS noted that Mr. Rozelle and Ms. Salamida had "not had contact due to the current Order of Protection that is in place." *Id.*

On September 27, 2018, McEwan advised Ames that the Endicott Police Department "can establish jurisdiction if Florida does [a Child Advocacy Center] Forensic interview with the child. Any outcry statements made by [sic] child may be admissible and skip hearsay rules." Dkt. No. 114-1 at ¶ 63. McEwan stated that the Endicott Police Department "may open an investigation" only after receiving a video of a forensic interview. *Id.* at ¶ 64.

On October 1, 2018, Ames contacted Tammy Champion at Florida's Department of Children and Family Services ("CFS") to request a forensic interview of K.S. as well as written statements from K.S. and anyone to whom she disclosed the alleged abuse. *See id.* at ¶ 66. Ames faxed a letter to CFS indicating that Broome County Social Services "wish[ed] to prosecute [Plaintiff] and need[ed] [CFS's] help to do so." *Id.* at ¶ 388; *see also* Dkt. No. Sealed 117 at 155. CFS reviewed the report and initiated an investigation on October 26, 2018. *See id.* at ¶ 67.

On November 2, 2018, K.S. was forensically interviewed by Sandra Wood, a Florida CFS Certified Forensic Interviewer. *See id.* at ¶ 70. On November 7, 2018, a CFS Caseworker, Jasmine Josey, notified CFS that K.S. had been forensically interviewed. *See id.* at ¶ 68.

During the forensic interview, Ms. Wood informed K.S. that she should not guess or respond to something if she does not know the answer. *See id.* at ¶ 71. Ms. Wood told K.S. that if she did not understand a question, to tell Ms. Wood, and Ms. Wood would repeat the question. *See id.* at ¶ 72. Ms. Wood instructed K.S. to correct her if Ms. Wood said anything incorrectly

and to not change any answers just because Ms. Wood might ask the same thing more than once. *See id.* at ¶¶ 73-74. Ms. Wood explained that if she repeats herself, it is just to make sure she has the information correct. *See id.* at ¶ 74. Ms. Wood reiterated to K.S. that she just wanted to make sure that everything she and K.S. discussed was "true and are things that really happened." *Id.* at ¶ 75. K.S. promised "to talk about the truth and things that really happened[.]" *Id.* at ¶ 76. Ms. Wood also explained to K.S. that she would be recording the interview with a camera and taking notes during the conversation. *See id.* at ¶ 77.

Ms. Wood asked K.S. to talk about her mom's boyfriend, who K.S. identified as "Ryan" and said that "he was mean." *Id.* at ¶¶ 79-80. K.S. identified Ryan's last name as "Brown." *Id.* at ¶ 81. K.S. stated that Ryan "did bad things" and "hurt" her. *Id.* at ¶¶ 82-83. K.S. wrote on a piece of paper provided by the Ms. Wood that Ryan would touch her "upper and lower with a rubber thingy that vibrated and it hurt bad. He did this with his mouth to. He used to put his private parts with my pee parts. He has sucked on my toes." *Id.* at ¶ 84. K.S. explained that the device made a "vibrating noise, like a massager would do," and stated that it changed colors. *Id.* at ¶¶ 87-88. K.S. explained that "upper" and "lower" meant her "privates." *Id.* at ¶ 89. K.S. further clarified that her "privates" are the areas of her body used to urinate in the bathroom. *Id.* at ¶ 90.

K.S. told Ms. Wood that the abuse began when she was five years old which she remembered because she was in first grade and had just turned five years old. *See id.* at ¶¶ 91-92. K.S. stated that the conduct occurred when she was five-to-eight years old. *See id.* at ¶ 97. She explained to Ms. Wood that the abuse occurred in her bedroom and began when her mother was home. *See id.* at ¶¶ 93, 96. K.S. described a "white balloon" that was sometimes used. *Id.* at ¶¶ 99-101. She drew a picture of the "balloon" and, without prompting, she spelled out the word,

"Condom." *Id.* at ¶ 101.  K.S. proceeded to describe the precise acts of abuse including use of the

"rubber thingy," "his private part," and "his finger." *Id.* at ¶¶ 103-14.  K.S. stated that the last

time of abuse was when she was eleven years old, which occurred when her mom was napping.

*See id.* at ¶¶ 115-16.

K.S. described her home as a downstairs apartment on East Franklin Street.  *See id.* at ¶

117.  K.S. told Ms. Wood that Plaintiff once made K.S. touch his private parts.  *See id.* at ¶¶ 118-

21.  K.S. stated that Plaintiff told her if she told anyone, he would kill her mother.  *See id.* at 122.

K.S. also disclosed that her mother's previous boyfriend, Eric, abused her once.  *See id.* at ¶¶ 123-

24.  She stated it occurred when she was four years old.  *See id.* at ¶ 123.

The Endicott Police Department received the DVD containing the video of the forensic

interview on December 27, 2018.  *See id.* at ¶ 127.  McEwan submitted the DVD into evidence

for processing and contacted Ames for additional family information.  *See id.* at ¶¶ 128-29.  Ames

explained that K.S. disclosed the alleged abuse to her uncle and a report was made to Florida.  *See*

*id.* at ¶ 130.  Ames also told McEwan that K.S. disclosed the conduct to a doctor during a physical

examination in August or September 2018.  *See id.* at ¶ 131.  Ames noted that K.S., R.O., and Ms.

Salamida used to live at 401 East Franklin Street in Endicott, New York.  *See id.* at ¶ 134.  Ames

also informed McEwan that K.S.'s biological father is Kevin Rozelle.  *See id.* at ¶ 133.

"Ames indicated to Det. McEwan that there was a history of Brown and K.S. in Broome

County Department of Social Services Child Protective Services' database, but neither he nor any

other CPS caseworker provided any specific information to Det. McEwan at this time or any other

time during the investigation regarding the same." *Id.* at ¶ 135.  "Ames also informed Det.

McEwan that R.O. contacted CPS on multiple occasions for reports of domestic abuse by

[Plaintiff], but neither he nor any other CPS caseworker provided any specific information to Det.

McEwan at this time or any other time during the investigation regarding the same." *Id.* at ¶ 136. McEwan noted in his case file, "Refer also to CPS Reports." *Id.* at ¶ 137.

After reviewing K.S.'s forensic interview, McEwan asked Ames if K.S. "has any developmental issues." Sealed Dkt. No. 117 at 159. McEwan stated that K.S. did not present "as mentally developed as her age would suggest." *Id.* Ames told McEwan that he did not know anything about K.S. besides the information her uncle relayed. *See id.* Ames stated that he did not have any information on Plaintiff, but that "there is a grandmother . . . who may know something about him." *Id.*

McEwan was unaware of where Plaintiff was living at the time. *See* Dkt. No. 114-1 at ¶ 138. On January 10, 2019, McEwan ran a driver's license inquiry through the New York State Division of Criminal Justice Services eJustice Criminal Repository System. *See id.* at ¶ 139. The report returned numerous individuals named "Ryan Brown," including one result with Plaintiff's previous address in Endicott, New York. *Id.* at ¶ 140. Plaintiff avers that the report "show[s] no connection between Plaintiff and 401 East Franklin prior to 2013, after K.S. turned 8." *Id.* The report cited by Plaintiff does not include any dates associated with the addresses. *See* Sealed Dkt. No. 85-10 at 26. Another report in the record, however, does indicate that Plaintiff lived at 401 E Franklin St address between July 5, 2013, and August 20, 2016. *See* Sealed Dkt. No. 117 at 45. McEwan also ran a criminal history inquiry for Plaintiff which returned an arrest and conviction for Driving While Ability Impaired and the conviction for Acting in a Manner Injurious to a Child Less than 17. *See* Dkt. No. 114-1 at ¶¶ 143-44.

On February 12, 2019, Endicott Police Department submitted the case to Defendant Milks as the Deputy Chief Assistant District Attorney for Broome County. *See id.* at ¶ 145. On

10

February 13, 2019, Caseworker Kristi Green closed the CPS investigation "with the designation 'indicated.'" *Id.* at ¶ 147.

On March 1, 2019, McEwan and another Endicott Police Department Detective interviewed R.O. at her residence. *See id.* at ¶ 149. R.O. confirmed that she used to live with K.S. and their mother in Endicott. *See id.* at ¶ 150. R.O. explained that Plaintiff moved in with them when she was in the fifth grade and that he was "'paranoid' and a 'schizo' who drank 2 bottles of vodka per day and possible methamphetamine." *Id.* at ¶ 152. R.O. also said Plaintiff told her that his father was the leader of the Hells Angels, and he would describe pig farms and chopping people up. *See id.* She explained to the detectives that Plaintiff put tape recorders and video cameras in every room of the apartment and was physically abusive. *See id.* at ¶¶ 154-55. R.O. described an incident where Plaintiff pulled her out of the shower and told her she did not deserve to shower at age 13 or 14. *See id.* at ¶ 156. She also explained that Plaintiff once slammed her in between the front door and a wall, and "carv[ed] hundreds of cuts into" her mother's back. *Id.* at ¶¶ 157-58. R.O. stated that Plaintiff never touched her sexually. *See id.* at ¶ 155. R.O. told the detectives that Plaintiff kicked her dog, although later in her grand jury testimony, she stated that Plaintiff kicked the dog out of the house. *See id.* at ¶ 159. R.O. stated that Plaintiff would have "story time" with K.S. in K.S.'s bedroom at 8:00pm every night. *Id.* at ¶ 160. "R.O. stated that she 'had a feeling that [Plaintiff] may have done something to [K.S.],' and that she talked to her mother and grandmother about it." *Id.* at ¶ 161.

On March 8, 2019, McEwan reviewed investigation progress notes provided to him by DSS. *See id.* at ¶ 162. In DSS's record production, it did not disclose any unfounded CPS allegations. *See id.* at ¶ 165. McEwan was never in possession of any unfounded CPS reports regarding Plaintiff, K.S., or R.O. during his criminal investigation. *See id.* at ¶ 166. The parties

agree that no unfounded reports were communicated by any caseworker to anyone in the Endicott Police Department.  *See id.* at ¶ 167.  Rather, Plaintiff argues that the Endicott Police Department was legally authorized to access unfounded CPS reports.  *See id.* at ¶ 166.  Plaintiff contends that "McEwan was in constructive possession of the records at all times."  *Id.*  The Endicott Defendants aver that the records are legally sealed and only provided to the Police Department or the District Attorney in extremely limited circumstances.  *See id.*

The Endicott Defendants assert that unfounded reports can only be released if the subject of the report authorizes their release or the District Attorney's Office is prosecuting a false reporting crime.  *See id.* at ¶ 170.  The Endicott Defendants also agree, however, that DSS can review prior unfounded reports that are sealed if it later receives another report about the same individuals.  *See id.* at ¶ 171.  They argue that, "[r]egardless, [] McEwan neither requested any unfounded CPS reports related to Brown, K.S., or R.O., nor did he receive them, have access to them, or review them at any time during the police investigation."  *Id.* at ¶ 172.  Plaintiff again disputes this contention, asserting that McEwan was legally authorized to obtain unfounded reports.  *See id.*

The parties rely on distinct provisions in New York Social Services Law § 422.  *See id.* at ¶ 166.  Section 422 concerns the "Statewide central register of child abuse and maltreatment." N.Y. Soc. Serv. L. § 422.  Section 5 of the statute notes that, concerning unfounded CPS reports, "all information identifying the subjects of the report and other persons named in the report shall be legally sealed forthwith by the central register and any local child protective services which investigated the report."  *Id.* § 422(5)(a).  However, the statute provides specific exceptions under which "[s]uch unfounded reports may [] be unsealed and made available[.]"  *Id.*  The Endicott Defendants aver that DSS and the Endicott Police Department could not have obtained unfounded

CPS reports related to Plaintiff or K.S. because § 422(5)(a)(v) only permits those reports to be provided to a district attorney, assistant district attorney, or police officers "when such official verifies that the report is necessary to conduct an active investigation or prosecution" for falsely reporting an incident under New York Penal Law § 240.50. *Id.* § 422(5)(a)(v); *see also* Dkt. No. 114-1 at ¶ 166. Plaintiff relies on subsection (a)(iii) which permits disclosure of unfounded CPS reports "to a local child protective service, the office of children and family services, or all members of a local or regional multidisciplinary investigative team . . . when investigating a subsequent report of suspected abuse, neglect or maltreatment involving a subject of the unfounded report, a child named in the unfounded report, or a child's sibling named in the unfounded report." N.Y. Soc. Serv. L. § 422(5)(a)(iii); *see also* Dkt. No. 114-1 at ¶ 168. Plaintiff asserts that the Endicott Police Department and McEwan were members of the Regional Multi-Disciplinary Team ("MDT"); therefore, McEwan could have accessed the unfounded CPS reports that were made against Plaintiff. *See* Dkt. No. 114-1 at ¶ 168-70.

The Endicott Defendants present the deposition testimony of Assistant Chief of Police Craig Williams and DSS Attorney Howard Schultz insofar as they both testified that they were not permitted to receive unfounded Social Services reports because they are sealed. *See* Dkt. No. 114-1 at ¶ 166. Mr. Schultz explained that he was involved in responding to Plaintiff's discovery request for this case and stated as follows:

> There was discovery involving the plaintiff's Child Protective Services records. So there was a vetting of the records between the indicated records and the unfounded records. Because unfounded records are legally sealed. And it's limited in how they can be disclosed or re-disclosed. So I had a role in that.
>
> And as to the indicated records, those were compiled -- and in this case my recollection is even the unfounded records because one of the exceptions is that the subject of the investigation can

> receive the unfounded records, and I believe your office represents
> the plaintiff.  So there was a compilation of the indicated and
> unfounded records to be disclosed as part of the discovery process
> in the civil litigation.

Dkt. No. 85-15 at 11-12.  Mr. Schultz was asked if there were any other situations under which

unfounded records could be produced and he stated as follows:

> There's another major exception.  The District Attorney's
> Office, if they're prosecuting false reporting to the New York State
> Central Registry, they can certify that they're investigating towards
> prosecution or actually prosecuting someone for making false
> reports to the New York State Central Registry.  And then the
> District Attorney's Office, under that limited exception, can receive
> unfounded records.
>
> The subjects of investigation, if they wanted to, they could
> disclose their records to the District Attorney's Office.

*Id.* at 12.  Mr. Schultz affirmed that he could only provide unfounded reports under the exception

he articulated.  *See id.* at 13.  He explained that no unfounded records were disclosed to the

District Attorney's Office in Plaintiff's case and that it would have been improper unless there was

a prosecution for making a false statement or report.  *See id.* at 17.  Mr. Schultz reiterated that the

unfounded reports "are legally sealed." *Id.* at 20.  He then explained, however, that "unfounded

records can be disclosed to the Social Services Department." *Id.* at 22.  Specifically, "if an

investigation is unfounded and then a period of time later there's another report to the New York

State Central Registry, the Social Services Department is mandated to look at the prior unfounded

sealed records as part of the history." *Id.* at 22-23.  Mr. Schultz repeated this understanding later

in his deposition.  *See id.* at 71.

Assistant Chief of Police Williams testified that to obtain unfounded reports, he has "to go

through the District Attorney's Office to obtain them."  Dkt. No. 85-24 at 57.  Mr. Williams stated

that he is not allowed to receive unfounded reports, and he has never received them.  *See id.* at 61-62.

Milks also testified during her deposition that she was never allowed to receive unfounded reports.  *See* Dkt. No. 85-19 at 34.  However, because they were a part of the investigative file, Milks was aware of the two indicated reports—one against Plaintiff and one against K.S.'s biological father, Mr. Rozelle.  *See* Sealed Dkt. No. 117 at 152.  Endicott Defendants also admit that McEwan's police report indicates that Ames told McEwan that "there is a history of [Plaintiff] and [K.S.] in CPS."  *Id.* at ¶ 173.  McEwan wrote this in his investigative file.  *See* Sealed Dkt. No. 117 at 3.

On March 4, 2019, McEwan ran a registration inquiry for Plaintiff through eJustice and discovered that Plaintiff's New York vehicle registration had expired in 2018.  *See* Dkt. No. 114-1 at ¶ 174.  Between March and April 2019, McEwan made several inquiries concerning Plaintiff's whereabouts through Law Enforcement Records Management System "and various people finders [sic] websites."  *Id.* at ¶ 176.  Endicott Defendants state that "McEwan contacted several potential relatives or contacts of Plaintiff to ascertain his whereabouts."  *Id.* at ¶ 177.  Plaintiff denies this assertion, stating that McEwan only contacted relatives of K.S., "but did not so much as call the phone number listed for Plaintiff on the reports he ran."  *Id.*  McEwan contacted the current residents of the Endicott apartment, an individual he thought to be one of Plaintiff's relatives but was not, K.S.'s grandmother, and R.O.  *See id.* at ¶¶ 178-181.

The parties agree that "McEwan contacted K.S.'s grandmother, Paula Salamida (with no success)."  *Id.* at ¶ 180.  However, in his investigative file, McEwan explained that, on his first attempt to contact K.S.'s grandmother, he left her a message to call him.  *See* Sealed Dkt. No. 117 at 7.  She called McEwan a few days later and advised that she had no information about

Plaintiff's whereabouts because the last time she had any contact with him was after her daughter's death.  *See id.*  "She stated that at that time she didn't like his tone and she deleted and blocked him from her phone."  *Id.*  There is nothing in the record indicating that McEwan asked the grandmother about R.O.'s statement that she spoke with the grandmother about Plaintiff and thinking he "may have done something to K.S."  Dkt. No. 114-1 at ¶ 161.

McEwan asked R.O. about her mother's other boyfriend named Eric, but R.O. said she did not remember someone by that name, but that her mother dated a man before Plaintiff when they lived on Odell Avenue or North Rogers Avenue.  *See id.* at ¶ 182.

On April 12, 2019, McEwan contacted Defendant Milks and informed her that he was unable to locate Plaintiff and did not have any success gathering information from any contacts or relatives.  *See id.* at ¶¶ 185-87.  McEwan told Milks he would send her the video of the forensic interview.  *See id.* at ¶ 188.  McEwan marked the case "division closed" pending additional information on Plaintiff or a decision from the District Attorney's Office to proceed.  *Id.* at ¶ 190.

On May 14, 2019, Milks told McEwan to contact K.S.'s aunt to set up a time for Milks to speak with K.S. and consider her potential testimony for a grand jury proceeding.  *See id.* at ¶ 191.  McEwan spoke to K.S.'s aunt on May 16, 2019.  *See id.* at ¶ 192.  On May 23, 2019, K.S.'s aunt agreed to travel with K.S. to New York on June 10, 2019, for an interview and grand jury proceeding.  *See id.* at ¶ 193.  Prior to the first meeting with Milks, McEwan, and K.S., Milks had already scheduled the grand jury.  *See id.* at ¶ 392; *see also* Dkt. No. 85-19 at 136-37.

During her deposition, Milks testified that, prior to ever meeting K.S., she "thought there was enough there to present to a grand jury for them to make a determination.  However, [she] still wanted to talk to [K.S.].  [She] still wanted to make that assessment after [she] talked to [K.S.]."  Dkt. No. 85-19 at 136.

McEwan and Milks met with K.S. and her aunt on June 11, 2019. *See id.* at ¶ 195. The Endicott Defendants contend that "[d]uring the interview, K.S. discussed details of the abuse and correctly identified Plaintiff in a photo identified by Det. McEwan." *Id.* at ¶ 196. Plaintiff objects, stating that the details of the alleged misconduct were not discussed during this meeting. *See id.* In McEwan's investigative file, he stated that, during the meeting, K.S. "discussed details of the abuse [Plaintiff] committed against her. She also identified [Plaintiff] in a photo [McEwan] provided her." Sealed Dkt. No. 117 at 8.

On June 11, 2019, McEwan also spoke to Suzanne Russo, Ms. Salamida's cousin. *See id.* at ¶ 197. Ms. Russo spoke about Plaintiff and Ms. Salamida's relationship as well as Ms. Russo's observations that K.S. "was talking like a baby" and that "her behavior had changed . . . she suspected something was going on." *Id.*

On July 25, 2019, McEwan and Milks conducted another interview with K.S. wherein K.S. denied penetration had occurred with Plaintiff. *See id.* at ¶ 198. On July 26, 2019, Milks conducted an interview with K.S., alone. *See id.* at ¶ 199. She conducted the interview without McEwan's knowledge. *See id.* at ¶ 200. According to Milks, K.S. reconfirmed the details of the abuse she has disclosed during her forensic interview. *See id.* at ¶¶ 202-03. Milks reported that K.S. was nervous and scared to testify in the grand jury because there might be men in the room and that she was upset "the lady in Florida" told other people about her allegations. *Id.* at ¶¶ 203-04. McEwan did not learn of this second interview until August 13, 2019, when Milks e-mailed McEwan explaining the second meeting. *See* Sealed Dkt. No. 117 at 150. Milks told McEwan that after the meeting where K.S. "told us that no penetration has ever occurred with [Plaintiff] (inconsistent with her CAC interview), I decided to interview her again in the morning of July 26,

2019, this time alone so that there was no make present (because I sensed that maybe a male being present on July 25th might have been a problem for her)." *Id.*

On July 26, 2019, a search for Plaintiff's current address by the Broome County District Attorney's Office revealed that he lived in Endicott between 2013 and 2016. *See* Dkt. No. 114-1 at ¶ 205. The investigator learned that Plaintiff had been residing in Tennessee since June 11, 2018. *See id.* at ¶ 206. Milks asked McEwan to travel to Tennessee to locate Plaintiff. *See id.* at ¶ 207. McEwan contacted the Springfield, Tennessee Police Department and Robertson County Sheriff's Office to attempt to locate Plaintiff. *See id.* at ¶ 208. A Robertson County Sheriff's Office Detective confirmed Plaintiff's address in Tennessee. *See id.* at ¶ 209. McEwan confirmed that a photo provided by the detective was Plaintiff. *See id.* at ¶ 210. McEwan briefed his supervisor on the case and traveled with another detective to Tennessee. *See id.* at ¶¶ 211-12.

McEwan spoke with two individuals located at Plaintiff's address who informed McEwan that Plaintiff used to live with them, but they asked him to move out because of "his drinking and popping pills." *Id.* at ¶ 213-14. McEwan discovered that Plaintiff was working at a junior high school, to which McEwan and the other detective then drove. *See id.* at ¶¶ 215-16. McEwan's goal was not to arrest Plaintiff at this time but speak with Plaintiff about K.S.'s allegations. *See id.* at ¶¶ 217-18. McEwan located Plaintiff inside the kitchen area of the school where he was repairing equipment and McEwan introduced himself. *See id.* at ¶ 220. The Endicott Defendants contend that "Plaintiff appeared surprised, began to visibly shake, and put his hands on the counter in what appeared to be an attempt to steady himself." *Id.* at ¶ 221. Plaintiff disagrees, stating that he "had a tobacco spit cup in one hand, a tin of tobacco in the other, which was replaced with his work tablet moments later so he could do administrative work." *Id.*

McEwan explained the reason for his visit and asked if Plaintiff would accompany him to the Bowling Green Police Department. *See id.* at ¶¶ 222-23. Plaintiff agreed to go and joined McEwan and the other detective in the unmarked detective vehicle when he completed his work. *See id.* at ¶¶ 224-25. McEwan read Plaintiff his *Miranda* warnings, which Plaintiff waived and agreed to speak with McEwan. *See id.* at ¶¶ 226-27. After arriving at the police station, McEwan conducted a recorded interview. *See id.* at ¶ 228.

During the interview, Plaintiff admitted moving in with Ms. Salamida and her two daughters at Odell Avenue and later moving with them to 401 East Franklin Street. *See id.* at ¶¶ 229-30. He also admitted to reading K.S. bedtime stores at night when they lived at that apartment. *See id.* at ¶ 231. Plaintiff denied inappropriately touching K.S. *See id.* at ¶ 232. Plaintiff told McEwan that "Dan S." lived with Ms. Salamida and her children for years prior to Plaintiff living with the family. *See id.* at ¶ 408. Plaintiff then requested an attorney, and the interview stopped. *See id.* at ¶ 233. On August 2, 2019, McEwan received a letter from Plaintiff's attorney requesting that McEwan refrain from speaking with Plaintiff about the subject of the investigation. *See id.* at ¶ 234. McEwan had no further contact with Plaintiff. *See id.* at ¶ 235. On August 27, 2019, McEwan submitted the video of his interview with Plaintiff and the reports from his conversations with Plaintiff's old roommates into evidence. *See id.* at ¶ 236.

On July 26 and August 9, 2019, Milks presented the case to a grand jury. *See id.* at ¶ 237. K.S., R.O., and McEwan testified before the grand jury. *See id.* at ¶¶ 238, 265, 278. K.S. confirmed that she lived at 401 East Franklin Street and 315 Odell Avenue in Endicott, New York. *See id.* at ¶ 239. Milks asked K.S. if anyone else lived with her at the Odell address, and K.S. responded, "[m]y mom's boyfriend." *Id.* at ¶¶ 240-41. Milks asked K.S. to name her mom's boyfriend, and K.S. responded, "Ryan Brown." *Id.* at ¶ 242. K.S. testified that Plaintiff lived

with her at Franklin Street when she was around seven years old. *See id.* at ¶¶ 243-44. She

explained that she saw Plaintiff's "private parts" and he touched her "private parts." *Id.* at ¶¶ 245-

46. K.S. stated that the conduct occurred from age five until Plaintiff moved out when she was

around ten years old. *See id.* at 247. She testified that the conduct occurred at Odell Avenue and

Franklin Street. *See id.* at ¶ 248. K.S. stated that the first time the conduct occurred was at the

Odell address. *See id.* at ¶ 250. She stated that it happened "a lot." *Id.* at ¶ 251. K.S. provided

details of the alleged sexual conduct. *See id.* at ¶¶ 252-53, 260-64. When asked what house she

was living in when the sexual intercourse occurred, K.S. responded, "Odell house." *Id.* at ¶ 254.

Milks asked, "Did he put his private parts inside of you at the Franklin Address, too?" *Id.* at ¶

255. K.S. responded, "Yes." *Id.* at ¶ 256.

     R.O. testified that she was K.S.'s older sister and she lived at the Odell address with their

mother and K.S. *See id.* at ¶¶ 265, 271. She testified that K.S. was in first or second grade when

they moved out of the Odell address. *See id.* at ¶ 272. R.O. stated that Plaintiff moved in with

them at the East Franklin address. *See id.* at ¶ 274. She explained that Plaintiff's story time with

K.S. was every night around 8:00 pm, but she might have seen her mom standing in the doorway

during story time a few times. *See id.* at ¶ 277.

     On August 9, 2019, McEwan testified before the grand jury. *See id.* at ¶ 278. McEwan

testified that he is certified as a Forensic Interviewer of Children and has specialized training

concerning child sex abuse cases. *See id.* at ¶ 280. McEwan then outlined his investigation of the

case. *See id.* at ¶¶ 281-88. McEwan discussed his interview with Plaintiff, which included

Plaintiff admitting that he moved in with K.S., R.O., and Ms. Salamida at Odell Avenue and then

they all moved to East Franklin Street. *See id.* at ¶ 289. McEwan also testified that Plaintiff

appeared nervous when McEwan approached him, but that Plaintiff denied any inappropriate touching.  *See id.* at ¶¶ 291-92.

Milks charged the grand jury with indicting Plaintiff with Predatory Sexual Assault Against a Child which required three elements: (1) Plaintiff committed a Course of Sexual Conduct Against a Child in the First degree; (2) the victim was less than 13 years old; and (3) Plaintiff was 18 years old or more.  *See id.* at ¶¶ 293-94.  Milks informed the grand jury that it could only indict Plaintiff if it found legally sufficient evidence to conclude the crime was committed and reasonable cause to believe that Plaintiff was the one who committed the crime.  *See id.* at ¶ 294.  A juror on the grand jury asked Milks if all she had to present was K.S.'s testimony.  *See* Sealed Dkt. No. 85-26 at 74.  Milks responded, said "That's correct. . . . Yep."  *Id.*  A juror also asked, "Everybody else has denied or doesn't know or whatever?"  *Id.*  Milks said, "Well, you've heard from everyone else."  *Id.*  Milks then explained to the grand jury that "[i]t would be the evidence presented to you during the presentation of the case.  And you're here not to decide guilt or innocence but to decide whether there's legally sufficient evidence to conclude that the crime was . . . ."  *Id.* at 75.  A juror interrupted Milks' statement and asked, "Based on what she said here?"  *Id.*  Milks responded, "Correct."  *Id.*

That same day, on August 9, 2019, the grand jury returned an indictment against Plaintiff.  *See id.* at ¶ 297.  The indictment charged Plaintiff with a Course of Sexual Conduct Against a Child in the First Degree alleging that between May 22, 2011, and December 31, 2016, Plaintiff, being 18 years or older engaged in two or more sexual acts with an individual less than 13 years old at 310 Odell Avenue and 401 East Franklin Street.  *See id.* at ¶ 298.  An arrest warrant was issued for Plaintiff by County Judge Joseph F. Cawley.  *See id.* at ¶ 299.  Plaintiff was arrested by U.S. Marshals in Chapmansboro, Tennessee.  *See id.* at ¶ 301.  Plaintiff was not arrested by

McEwan or any other Endicott Police Officer. *See id.* at ¶ 302. McEwan was unaware of the indictment until after Plaintiff was arrested in Tennessee. *See id.* at ¶ 303.

The parties' statement of material facts and responses do not explain when McEwan learned of the arrest warrant being issued or of Plaintiff's actual arrest. McEwan gave his grand jury testimony the same day the indictment was returned, and the arrest warrant was issued. *See id.* at ¶¶ 278, 297, 299. The arrest warrant from Broome County Judge Joseph F. Cawley commanded "[a]ny sworn officer of the division of the state police of the State of New York, the Sheriff, the Undersheriff, or any deputy sheriff of Broome County, and any sworn officer of the county of Broome" to arrest Plaintiff. *Id.* at ¶ 300. Plaintiff was held in Tennessee prior to extradition to New York. *See id.* at ¶ 304.

Plaintiff asserts that the "Endicott Defendants effectuated the arrest indirectly" and relies on an e-mail from Milks to Assistant Police Chief Williams from June 2020. *Id.* at ¶ 302. The e-mail related to an investigation of someone entirely unrelated to Plaintiff's case. *See* Sealed Dkt. No. 118-6 at 15. The individual being investigated lived in Florida and Milks stated, "if there is a warrant for his arrest without an indictment, it falls on either your office or my office for the expense of bringing him back. If there is a warrant for his arrest on an indictment, there is a MOU between county court and the sheriff's office wherein the sheriff's office will arrange to get him using grant money. And on a side note, if we do a direct presentation he also doesn't get an opportunity to testify at grand jury." *Id.*

While Plaintiff was incarcerated, he did not obtain copies of the CPS reports related to K.S., R.O., or Plaintiff. *See id.* at ¶ 305. Plaintiff testified during his deposition that he was told he could not have copies of the reports. *See id.* at ¶ 306.

Between August 9 and 30, 2019, McEwan completed his investigative file. *See id.* at ¶ 307. On August 13, 2019, Milks e-mailed McEwan the details of her second interview with K.S. *See id.* at ¶ 308. McEwan forwarded his investigative file to Milks on August 30, 2019. *See id.* at ¶ 310. There is no indication from either party that Milks took any actions related to Plaintiff's case after receiving the investigative file, until Milks e-mailed McEwan concerning a hearing.

On March 13, 2020, Milks notified McEwan that she was foregoing a *Huntley* hearing. *See id.* at ¶ 311.[1] Plaintiff asserts that "Milks notified McEwan that she . . . was intending to force Plaintiff to testify on his own behalf in violation of the Fifth Amendment." *Id.* The Endicott Defendants contend that Milks did not indicate she was intending to force Plaintiff to testify. *See id.* In an e-mail dated March 13, 2020, which was shown to McEwan during his deposition, Milks told McEwan, "I think we are going to forego the Huntley hearing, so I won[']t need you on Monday. I am going to force him to testify at trial if he wants to say he didn't do it." Sealed Dkt. No. 85-11 at 34. After receiving this email, McEwan had no further involvement in Plaintiff's case. *See* Dkt. No. 114-1 at ¶ 312.

On April 15, 2020, Plaintiff's defense attorney asked Milks if there were additional CPS records, and Milks submitted a records' request from DSS. *See id.* at ¶ 313. DSS provided Milks with "indicated" CPS reports regarding K.S. and/or Plaintiff. *See id.* at ¶ 314. The reports Milks received were then provided to Plaintiff. *See id.* at ¶¶ 315, 317.

---

[1] "'In New York, a *Huntley* hearing is held if the prosecution intends to offer a defendant's confession. If the confession is challenged, a hearing is held in which the prosecution has the burden of proving, beyond a reasonable doubt, that a defendant's statement was voluntary.'" *Ortiz v. Wagstaff*, 523 F. Supp. 3d 347, 353 n.1 (W.D.N.Y. 2021) (quoting *Thomas v. Lord*, 396 F. Supp. 2d 327, 335-36 (E.D.N.Y. 2005)); *see also People v. Huntley*, 15 N.Y.2d 72 1965.

Milks made the request to DSS "pursuant to SSL section 422.4(A)(1)." Sealed Dkt. No.

85-20 at 1.[2] She stated as follows:

> This information is necessary to conduct a criminal investigation or
> criminal prosecution of a person, and there is reasonable cause to
> believe that such person is the subject of a report, and that it is
> reasonable to believe that due to the nature of the crime under
> investigation or prosecution, such person is the subject of a report,
> and that it is reasonable to believe that due to the nature of the
> crime under investigation or prosecution, such records may be
> relat[ed] to the criminal investigation or prosecution.

*Id.* Milks certified that the request was being made in her capacity as an Assistant District

Attorney for Broome County. *See id.*

Milk's request produced CPS reports indicating that R.O. said "her sister lies and makes

things up." *Id.* at 3. R.O. told a caseworker that she lived with her sister, mom, and Plaintiff. *See*

*id.* R.O. "said everything gets along fine. She said she and her sister argue. [R.O.] denied

anyone hurts her or her sister." *Id.* R.O. "denied [Plaintiff] ever hurts their feelings or calls them

names. [R.O.] denied [Plaintiff] makes threats to anyone." *Id.* She also "denied anyone makes

her feel uncomfortable." *Id.* The caseworker also interviewed K.S. who said that Plaintiff yelled

but "never hurts." *Id.* at 4. K.S. "said [Plaintiff] hurts her when he slaps her in the face when they

lived in the old house. [K.S.] said this was when she was five. [K.S.] said now she is 7. [K.S.]

said she just met [Plaintiff] last summer." *Id.* at 5. Later, "[K.S.] said [Plaintiff] did not actually

slap her. She said he just grabbed her write and twisted. [K.S.] said this was a long time ago.

[The caseworker] asked if this really happened and she said no. [The caseworker] asked why she

said this and she told this worker that she didn't know she had to tell the truth." *Id.* K.S.'s

---

[2] Citations to this sealed file are to the pagination generated in the top left corner of the pages.

principal also told the caseworker that the school had "issues in the past with [K.S.] not being truthful." *Id.* at 5. The caseworker noted that K.S. "kept changing her story." *Id.*

In an interview with Ms. Salamida, she denied Plaintiff was ever violent except for the night involving the coffee table. *See id.* at 7, 11. She said it was "mostly yelling." *Id.* R.O. also "denied any violence other than the night in question." *Id.* at 12. Ms. Salamida also told CPS that "her children are smart and can be manipulative." *Id.* at 7. The CPS records also noted two "unfounded" CPS reports, one in which allegations of "choking/twisting/shaking and inadequate guardianship" were made. *Id.* at 6. CPS stated that "[t]he child did not have any marks on her. Older sibling did not support the allegations." *Id.*

During her deposition, Milks testified that she "made an assumption that [she] had all the CPS related to these individuals." Dkt. No. 85-19 at 90. She "was then asked by the defense attorney at the time . . . [i]n April of 2020 to request CPS reports in case there was any more." *Id.* She "did and then immediately turned them over . . . ." *Id.* As to K.S.'s credibility, Milks testified that she "did not have any evidence to the contrary, nothing. So, that's – and [she] found [K.S.] credible." *Id.* at 103. Milks explained as follows: "that's what I went along with and that's what I did, but that doesn't even matter because this wasn't me. I presented the case to the grand jury, yes, but the grand jury is the one that chose to indict it, and then a judge reviewed it, and they found that that was sufficient." *Id.* Milks stated that she "probably" would have wanted to read the unfounded reports prior to going into grand jury. *Id.* at 192.

On January 20, 2021, Milks left the District Attorney's Office. Dkt. No. 114-1 at ¶ 318. Between indictment and when she left Broome County District Attorney's office, Milks spoke to K.S. or R.O. "zero" times. Dkt. No. 85-19 at 193.

Assistant District Attorney Christopher Ganz took over the case. *See id.* at ¶ 319. McEwan retired on February 16, 2021. *See id.* at ¶ 320. McEwan had no contact with Ganz about Plaintiff's case. *See id.* at ¶ 321. Ganz began trial preparation on Plaintiff's case in April 2021. *See id.* at ¶ 322.

In a memorandum, Ganz noted that he inherited the case from Milks in January 2021, but did not begin trial preparation on the case until mid-April because he was preparing for an April murder trial. *See* Sealed Dkt. No. 103-11 at 9. Ganz explained that he reached out to K.S.'s uncle to schedule another call with K.S. *See id.* K.S.'s uncle explained that she had recently been reconnecting with her biological father who would be accompanying K.S. for the interview. *See id.* K.S., her uncle, and her father arrived at the Broome County District Attorney's Office for another interview on May 28, 2021. *See id.*

During the interview, Ganz explained the process for trial and showed K.S. the courtroom. *See id.* at 9-10. K.S. returned on June 2, 2021, to discuss the substantive allegations underlying the case. *See id.* at 10. Ganz and a female attorney interviewed K.S. *See id.* Ganz noted that K.S. "was preoccupied with her phone. She spoke repeatedly about the significant number of men/boys who were contacting her on snapchat. [Ganz did] not recall her putting her phone down for any meaningful time as [they] discussed the case with her." *Id.* When discussing the allegations against Plaintiff, K.S. told the attorneys that Plaintiff "had never once, on any occasion, put his private part into her private part." *Id.* The attorneys "specified that [they] were referring to his penis and her vagina, and she reiterated several times that [Plaintiff] had never, on any occasion, put his penis into her vagina, attempted to put his penis into her vagina, or any penetration, however slight, had occurred." *Id.* Ganz noted that "[t]his consistent denial of sexual intercourse was unexpected because it contradicted [K.S.'s] grand jury testimony, where she

detailed numerous occasions of the defendant putting his penis into her vagina." *Id.*  Ganz "showed [K.S.] a copy of her grand jury testimony where she unequivocally testified that [Plaintiff] had done so and [Ganz] read it out loud to her.  [K.S.] responded, 'It's not ringing any bells in my memory but if I said it then it probably happened.'"  *Id.*

Ganz explained that "[t]his answer was concerning, but [he] moved on to the other allegations with plans to return to the topic of vaginal rape.  [He] asked [K.S.] if [Plaintiff] ever used his mouth or tongue on or in her vagina, like she had testified to in grand jury.  Similarly, [K.S.] denied this conduct." *Id.*  Ganz "showed her the grand jury testimony which clearly contradicted what she was telling [the attorneys], and again, [K.S.] responded that she didn't remember that ever happening." *Id.*  Ganz also asked K.S. about her statements concerning the "rubber thingy" and the "balloon" and she gave answers that were inconsistent with what she had stated during her forensic interview and grand jury testimony.  *Id.* at 10-11.  After the meeting, Ganz met with "Korchak to update him on the confounding responses [they] received." *Id.* at 11.  They proceeded as follows:

> We began to research lesser included offenses to see if any were viable, given that the indictment was for Predatory Sexual Assault and the underlying offense was Course of Sexual Conduct Against a Child, both of which require at least one act of sexual intercourse.  Our concern was that the victim was no longer disclosing sexual intercourse, but was disclosing digital penetration, which is insufficient to establish both the predicate and aggravated offenses.  I explained to DA Korchak how we planned to meet with the victim again in hope that she was having a bad day, or something similar, and our meeting ended.

*Id.*

On June 4, 2021, Ganz met again with K.S. and her father.  *See id.*  Ganz

> reiterated that her prior grand jury and forensic interview differed from what she told us on Wednesday, so that we wanted to know

the truth so we could act appropriately.  We reiterated that she was not in trouble and that we weren't mad, angry, or anything of the kind.

The victim reiterated to us the following: 1) that she was a virgin, 2) that defendant never put his penis in her vagina, 3) that defendant never tried to or slightly penetrated her vagina with his penis, 3) that he never used or tried to use his mouth or tongue on or in her vagina, 3) that he fingered her on numerous occasions,[3] 4) that he used the dildo on both her upper and lower privates, 5) that she didn't see him remove the condom from the wrapper, and 6) that on a few occasions he licked her toes.  Notably, during this meeting, the victim was consistently on her phone scrolling social media, and on a few occasions, was non-responsive to us in that she told us about how she had a considerable amount of new followers and boys messaging her on her new Instagram page.  Specifically, she told us about one boy who was 17 and how he was moving to Norwich from California.  She told us about how they planned to meet up, and subsequently, in what appeared to be real time, told us how he had proposed to her.

*Id.*  Ganz explained to K.S. that the lack of consistency in her statements was concerning such that the District Attorney's Office could not move forward with the case "when we knew we were unable to prove the case." *Id.* at 12.  He "explained to her in layman's terms how her expected testimony was insufficient to establish the charge in the indictment.  [He] told her that this issue would lead to [him] assuredly being unable to succeed and that [they] were going to have to dismiss the indictment pursuant to [their] ethical obligation not to proceed when [they] knew [they] had insufficient evidence." *Id.* at 12.

K.S. "remain[ed] silent for approximately 20 seconds, and then quietly said, 'Fuck. He's going to kill me.'  There was another silence for approximately 20 seconds, followed by [the female attorney] asking, 'What are you thinking right now that you aren't saying out loud[?]'" *Id.* K.S. "did not respond for approximately 15 seconds.  [She] responded he was going to hurt her, followed by another extended silence.  Her demeanor did not change and she continued to scroll

---

[3] The repetitious numbering is written how it appears in the quoted document.

on Instagram. [Ganz] asked her if she wanted us to explain what [Ganz] told her to her father, and she said yes. [Ganz] then brought her to a victim advocate's office . . . ." *Id.*

Ganz again spoke with Korchak and explained that he had "credibility concerns to the point that we felt it was our obligation not to proceed; in other words, it would be wrong for us to ask a jury to convict the defendant based on the victim's expected testimony." *Id.* Ganz then notified Plaintiff's attorney of his intention to move to dismiss the case. *See id.*

In his memorandum, Ganz noted that "[b]ased on the information provided to us by the victim in our meetings, [he] did not feel confident that we would survive a trial order of dismissal, and even if he did, [he] felt that we could not ethically proceed and ask a jury to convict [Plaintiff], given the numerous inconsistencies." *Id.* at 13. "It was [Ganz's] impression that abuse did occur, but [he] was not sure what the nature of it was, and therefore, [he] could not proceed." *Id.* Ganz said, "[i]t is also significant to note that based on the forensic interview, as well as the grand jury testimony, there was sufficient probable cause to charge and arrest [Plaintiff]. [He] remain[ed] unable to articulate the reason or reasons that led to [K.S.'s] inconsistent statements, however, and for the above stated reasons, [he] [stood] by the decision not to proceed." *Id.*

Ganz then moved to dismiss the indictment against Plaintiff. *See* Dkt. No. 114-1 at ¶ 336; *see also* Sealed Dkt. No. 103-11. In the motion to dismiss, Ganz stated that "[b]ased on the forensic interview, as well as the grand jury testimony, there was sufficient probable cause to charge and arrest the defendant. . . ." Dkt. No. 114-1 at ¶ 338. The indictment was dismissed on June 7, 2021. *See id.* at ¶ 339; *see also* Sealed Dkt. No. 85-29. The Endicott Defendants contend the dismissal was without prejudice, but Plaintiff argues that the charges could never have been brought again because of the lack of evidence supporting the charges. *See* Dkt. No. 114-1 at ¶

339. The Broome County Superior Criminal Court Disposition Report indicates only that the case was dismissed and sealed. *See* Sealed Dkt. No. 85-29.

In response to a discovery request in Plaintiff's civil case before this Court, DSS produced additional records pertaining to K.S., R.O., and Plaintiff. The records show that in February 2013, before Plaintiff and Ms. Salamida started dating, K.S. reported that Ms. Salamida choked, twisted, and shook K.S. *See id.* at ¶ 355. The allegation was deemed unfounded after the investigation revealed no marks on K.S. and "her older sister reported that K.S. made it all up." *Id.* at ¶ 356. In June 2013, K.S. reported that Plaintiff slapped her in the face and grabbed her wrists, but "then stated that it did not actually happen and that she lied because she did not know she had to tell the truth." *Id.* at ¶ 357. "K.S. stated that she makes things up and not everything is the truth." *Id.* at ¶ 358. In February 2014, K.S. reported that Plaintiff was a bully and threw a grill at Ms. Salamida. *See id.* at ¶ 359. A "caseworker noted that despite K.S. claiming she was afraid of Plaintiff, she was playing with him during a home visit, was comfortable with him, that K.S. has a 'history of lying', there was no evidence of a grill, and that K.S. has a referral to school counseling due to lying and bullying." *Id.* at ¶ 360. K.S. also stated "that her sister took a knife into her room to kill herself and that Plaintiff makes her mother stand in the cold." *Id.* at ¶ 361; *see also* Sealed Dkt. No. 85-21 at 16.

CPS also interviewed R.O. who reported as follows:

> K.S. makes up things to get attention, that K.S. is not disciplined, that Plaintiff did not throw a grill at anyone, that she did not have any arguments with Plaintiff, that Plaintiff would never hit her or her sister, that the story about taking a knife into her room was made up, that K.S. was going to go to school and tell everyone that her sister put a bag over her head and tried to kill her, and that K.S. believes if she makes enough claims about her mother and Plaintiff that []DSS will take her away (to presumably live with her father).

*Id.* at ¶ 362; *see also* Sealed Dkt. No. 85-21.

Ms. Salamida also reported to Social Services that she was having issues with K.S. making up stories. *See* Dkt. No. 114-1 at ¶ 363. K.S.'s grandfather reported "that K.S. has a vivid imagination and will tell stories that seem real, and that he talks to the family almost every day and had no concerns about their safety." *Id.* at ¶ 364. "On February 25, 2014, a school administrator indicated that K.S. has been referred to counseling and that K.S. lies to adults and children." *Id.* at ¶ 365. "In April 2014, [R.O.] reported to []DSS that Plaintiff slammed her into a door causing a laceration and scar to her ankle, and that her mother was using cocaine and other, worse, drugs." *Id.* at ¶ 366. "After voluntarily taking drug tests, it was shown that the allegation of either Plaintiff or [Ms. Salamida] using drugs was false." *Id.* at ¶ 367. Social Services found the allegations to be unfounded because of inconsistent claims made by "the older sister." *Id.* at ¶ 368. DSS also noted that R.O. began mental health treatment which was not known to Ms. Salamida. *Id.* at ¶ 369. R.O. sought to move in with her older sister, Nadine. *See id.* at ¶ 370. "During an April 7, 2014 interview with K.S., K.S. reported that she understands what a safe space was and that she felt safe at both school and home, including both her mother's house and biological father[']s house where she resided back and forth." *Id.* at ¶ 371. An Assistant Principal for K.S. reported that K.S. and her sister did not get along and that K.S. has been known as a storyteller. *See id.* at ¶ 372. Social Services noted that K.S.'s biological father had a history of drug and alcohol abuse and domestic violence. *See id.* at ¶ 373.

In a subsequent interview, R.O. denied Plaintiff physically assaulted her. *See id.* at ¶ 374. A counselor noted that she thought "that R.O. would embellish stories when she did not get her way, such as moving in with her older sister." *Id.* at ¶ 375. The April 2014 report against Plaintiff was deemed unfounded. *See id.* at ¶ 376. In May 2014, R.O. "stated that she made up

allegations of domestic violence and drug abuse by her mother and Plaintiff out of spite because she was mad at her mother." *Id.* at ¶ 378. In June 2014, R.O. stated that Social Services "twists her words, lies, and that she never said her mother or Plaintiff use drugs." *Id.* at ¶ 381.

Finally, Plaintiff brings claims against Broome County and Defendant Pomeroy for conduct which allegedly occurred during Plaintiff's incarceration at Broome County Jail ("BCJ"). The parties agree that Plaintiff refused a direct order to return to his bunk and he asked to be transferred to "the box." Dkt. No. 107-1 at ¶¶ 24-25. Plaintiff was escorted from his dorm to the medical unit. *See id.* at ¶ 26. Plaintiff was strip searched following his transfer to the medical unit. *See id.* at ¶ 28.

Plaintiff testified during his deposition that after he refused to follow the order and asked to be sent to "the box," Defendant Pomeroy and one other corrections officer spoke to Plaintiff for twenty-five-to-forty minutes. *See* Dkt. No. 94-1 at 17. The officers handcuffed Plaintiff to transfer him. *See id.* There were two or three other officers with Pomeroy. *See id.* Pomeroy and the other officers were calling Plaintiff names the entire time. *See id.* Plaintiff testified that Pomeroy "hit [Plaintiff's] head in the wall a few times really quickly" because Pomeroy "thought that [Plaintiff] was doing something" when Plaintiff "jerked [his own] arm." *Id.* at 18. Plaintiff stated that Pomeroy later punched him in the eye when Plaintiff was surrounded by seven or eight officers. *See id.* at 20-21. Plaintiff testified that once they reached the medical unit, Pomeroy had Plaintiff remove his clothes, bend over, and insert his fingers into his own anus. *See id.* at 23. Pomeroy then told Plaintiff to stick his fingers into his mouth. *See id.* Afterwards, Pomeroy and the other officers left the room Plaintiff was in. *See id.* at 24.

The Broome County Defendants dispute Plaintiff's version of events and assert that Pomeroy followed appropriate procedure and did not physically or verbally assault Plaintiff. *See*

Dkt. No. 107-2 at ¶¶ 29-31.  The Broome County Defendants argue that Plaintiff's version of events is not supported by the record because he "is attempting to use his own claims as proof of his own claims."  Dkt. No. 113-4 at ¶¶ 27-31.

The Broome County Defendants contend there is no evidence of Plaintiff suffering any injuries in the video surveillance footage, but Plaintiff states this is "because that five minute portion of the middle of the video of intentionally destroyed."  Dkt. No. 107-2 at ¶ 7.  Pomeroy explained during his deposition that video footage in BCJ would be archived for an entire event and would not omit portions of an incident.  *See* Dkt. No. 94-24 at 33.  Concerning the alleged incident with plaintiff, Pomeroy stated as follows:

> The event took place in two segments.  So he was brought up to intake.  He was put in a holding cell until a more permanent cell could be made available.  Once he was placed in that holding cell, that portion of the event was over.  Then I don't know the exact amount of time.  We were informed that the more permanent cell was made available and we archived the escort from that cell down to the medical cell.  And then his time in medical, until he was secured in a cell.

*Id.* at 34.  He agreed there was "[a] small section" of the timeline that was not archived.  *Id.* at 35.[4]

### III. DISCUSSION

**A.    Legal Standards**

*1. Motion to Dismiss*

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the party's claim for relief.  *See Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007) (citation omitted).  In considering the legal

---

[4] The Court has reviewed the video footage, which does not contain audio.  The Court will detail what is observed in the video later in this Memorandum-Decision and Order where such detail is relevant to the Court's analysis.

sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns, Inc. v. Shar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted). This presumption of truth, however, does not extend to legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," *see* FED. R. CIV. P. 8(a)(2), with sufficient factual "heft to 'sho[w] that the pleader is entitled to relief.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (quotation omitted). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *see id.* at 555 (citation omitted), and present claims that are "plausible on [their] face," *id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement of relief."'" *Id.* (quoting *Twombly*, 550 U.S. at 557). Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly*, 550 U.S. at 558, or where a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed." *Id.* at 570.

### 2. Motion for Summary Judgment

"The entry of summary judgment is warranted when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Doane v. United States*, 369 F. Supp. 3d 422, 438 (N.D.N.Y. 2019) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)); *see also* FED. R. CIV. P. 56(a). "A fact is 'material' if

it 'might affect the outcome of the suit under the governing law,' and a dispute is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Jennings v. Decker*, 359 F. Supp. 3d 196, 204 (N.D.N.Y. 2021) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also Doane*, 369 F. Supp. 3d at 438; *Kenney v. Clay*, 172 F. Supp. 3d 628, 635 (N.D.N.Y. 2016).

"'Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.'" *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (quoting *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996)). However, irrelevant or unnecessary factual disputes do not preclude summary judgment. *See Anderson*, 477 U.S. at 248. Only genuine disputes about a material fact, such that "the evidence is such that a reasonable jury could return a verdict for the nonmoving party" will preclude summary judgment. *Id.*

The party moving for summary judgment "bears the initial burden of demonstrating that there is no genuine issue of material fact to be decided with respect to any essential element of the claim." *Doane*, 369 F. Supp. 3d at 438. If the moving party establishes a prima facie basis for summary judgment and satisfies their burden, the burden then shifts to the nonmoving party, who must then "show, through affidavits or otherwise, that there is a material issue of fact for trial" that a reasonable jury could resolve in its favor. *Id.*; *see also Kenny*, 172 F. Supp. 3d at 635. Evidence that is not significantly probative, or "the mere existence of some alleged factual dispute between the parties[,] will not defeat an otherwise properly supported motion for summary judgment." *Kenny*, 172 F. Supp. 3d at 635-36 (quoting *Anderson*, 477 U.S. at 247-48); *see also Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993) ("Genuine issues of fact are not created by conclusory allegations"). The nonmoving party must show by more than a

"scintilla of evidence" that "a fact-finder could reasonably find for the non-movant." *Heublein*,

996 F.2d at 1461. In determining the existence of any genuine disputes of material fact, "a court

must resolve any ambiguities and draw all inferences from the facts in a light most favorable to

the nonmoving party." *Smith v. N.Y.S. Off. of Temp. & Disability Assistance*, 535 F. Supp. 3d 90,

94 (N.D.N.Y. 2021) (quoting *Ward v. Stewart*, 286 F. Supp. 3d 321, 327 (N.D.N.Y. 2017)); *see*

*also Jeffreys*, 426 F.3d at 553.

**B.      Dismissal of Claims Based on Consent**

In response to the Endicott Defendants' motion for summary judgment, Plaintiff concedes

that he cannot state a substantive due process claim because such a claim is redressable under the

Fourth Amendment. *See* Dkt. No. 108-1 at 19. Plaintiff also concedes that he fails to establish an

intentional infliction of emotional distress and *respondeat superior* claims. *See id.* at 39. As

such, the Court grants the Endicott Defendants' motion on those claims.

**C.      Merits of Remaining Claims**

**1. Administrative Exhaustion**

The Broome County Defendants argue that Plaintiff failed to exhaust his administrative

remedies related to any alleged conduct that occurred at BCJ. *See* Dkt. No. 94-30 at 30-31. They

assert that Plaintiff did not file any grievances while housed as BCJ. *See id.* Plaintiff argues that

he did not have to exhaust his administrative remedies because he has been released from

incarceration. *See* Dkt. No. 107-1 at 28.

The Second Circuit has expressly held "that litigants . . . who file prison condition actions

after release from confinement are no longer 'prisoners' for purposes of § 1997e(a) and, therefore,

need not satisfy the exhaustion requirements of this provision." *Greig v. Goord*, 169 F.3d 165,

167 (2d Cir. 1999). This is because "[t]he relevant time at which a person must be 'a prisoner'

within the meaning of the [Prison Litigation Reform Act ("PLRA")] in order for the Act's restrictions to apply is the moment the plaintiff files his complaint." *Jones v. Cuomo*, 2 F.4th 22, 26 (2d Cir. 2021) (quoting *Gibson v. City Municipality of New York*, 692 F.3d 198, 201 (2d Cir. 2012)) (additional quotation and quotation marks omitted).[5]

The Second Circuit has instructed that a plaintiff who has been released does not have to comply with the PLRA; therefore, the Court concludes the same in this case. Because Plaintiff filed his complaint after he was released from incarceration, he was not required to exhaust his administrative remedies. Accordingly, this aspect of the Broome County Defendants' motion is denied.

### 2. Mental Harm Claims Under the PLRA

The PLRA limits the ability of a plaintiff to bring an action based solely "for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act (as defined in section 2246 of Title 18)." 42 U.S.C.A. § 1997e(e).

The Broome County Defendants' entire argument in their motion on this issue consists of one sentence: "Evidence gained through discovery shows that Plaintiff has wholly failed in the above requirements to continue this suit." Dkt. No. 94-30 at 40. In their reply, the Broome County Defendants argue that Plaintiff's claims of physical injury are contradicted by other medical records and his "claims of sexual assault fail due to the fact no one touched him (nor used any object to touch him)." Dkt. No. 113 at 21. Plaintiff argues that the PLRA does not apply to him because he was not incarcerated at the time he filed his complaint. *See* Dkt. No. 107-1 at 44-

---

[5] There is a handful of cases from the Southern District of New York that have concluded otherwise; holding that a plaintiff must exhaust administrative remedies if he or she was still incarcerated during the time frame that the grievance was statutorily required to be filed. *See McCray v. Carter*, No. 21-CV-9051, 2022 WL 6854524, *4 (S.D.N.Y. Oct. 12, 2022) (collecting cases). Cases from another district are not binding on this Court.

45. Plaintiff notes that even if the Court applied the requirements of the PLRA, he sufficiently alleged that he was subject to physical and sexual assaults. *See id.* at 45.

In one case out of the Southern District of New York, the district court stated "that although the Second Circuit had held in another case that the PLRA's exhaustion requirement did not apply to individuals who were no longer incarcerated, its rationale could not be extended to § 1997e(e)'s physical injury requirement." *Lynch v. City of New York*, 335 F. Supp. 3d 645, 651 (S.D.N.Y. 2018) (citing *Cox v. Malone*, 199 F. Supp. 2d 135, 140 (S.D.N.Y. 2002)). "[T]he *Cox* court reasoned that the PLRA's exhaustion requirement was a procedural one meant to stem frivolous complaints by prisoners with little to lose and everything to gain. . . . Thus, requiring exhaustion by those who could no longer avail themselves of a facility's administrative remedies 'ma[de] no sense.' . . . By contrast, because the *Cox* court found that § 1997e(e)'s physical injury requirement was a 'substantive limitation on the type of actions,' the purpose of 'weed[ing] out frivolous claims where only emotional injuries are alleged' was equally served irrespective of whether the individual was detained or not at the time of filing." *Id.*

This Court has expressly rejected the reasoning of the *Cox* court. *See Kelsey v. Cnty. of Schoharie*, No. 04-CV-299, 2005 WL 1972557, *3 (N.D.N.Y. Aug. 5, 2005), *aff'd*, 2005 WL 8169541 (N.D.N.Y. Nov. 16, 2005). Other courts have likewise disagreed with *Cox*'s analysis and conclusion. *See Lynch*, 335 F. Supp. 3d at 651; *Hayes v. City of New York*, No. 12-CV-4370, 2014 WL 4626071, *12 (S.D.N.Y. Sept. 15, 2014) (relying on "the two Court of Appeals decisions, . . . and the numerous District Court decisions reaching the contrary result" to "conclude that the PLRA does not require an allegation of physical injury in an action concerning the conditions of confinement by an individual who is not incarcerated at the time the action is commenced"); *McBean v. City of New York*, 260 F.R.D. 120, 143 (S.D.N.Y. 2009); *see also*

*Lurch v. City of New York*, No. 19-CV-4350, 2020 WL 6551722, *3 (S.D.N.Y. Nov. 6, 2020)

(collecting cases discussing the inapplicability of the PLRA to individuals who were not

incarcerated when they filed their law suit).

The Broome County Defendants did not cite a single case to support the application of the

PLRA's physical injury requirement to this case. *See* Dkt. No. 94-30 at 9-40; Dkt. No. 113 at 21.

"This failing 'effectively places on the court the burden of conducting the initial legal analysis that

is properly the responsibility of [] counsel.'" *Wenzhou Wanli Food Co. v. Hop Chong Trading*

*Co., Inc.*, No. 98-CV-5045, 2000 WL 964944, *3 (S.D.N.Y. July 11, 2000) (quotation omitted).

Based on the Court's review of case law, because Plaintiff filed his complaint after he was

released from incarceration, the PLRA's physical injury requirement does not apply to Plaintiff's

allegations. Therefore, this aspect of the Broome County Defendants' motion is denied.

### 3. *Prosecutorial Immunity*

The Broome County Defendants argue that all claims against the Broome County District

Attorney Defendants must be dismissed under the doctrine of absolute immunity. *See* Dkt. No.

94-30 at 14-19. They argue that because Defendants Milks, Cornwell, and Korchack were acting

in their prosecutorial capacity at all times relevant to Plaintiff's claims, they are immune from suit.

*See id.* Plaintiff argues that those Defendants are not subject to prosecutorial immunity because

they engaged in investigative functions. *See* Dkt. No. 107-1 at 13-17.

"The doctrine of absolute immunity applies broadly to shield a prosecutor from liability

for money damages . . . in a § 1983 lawsuit, even when the result may be that a wronged plaintiff

is left without an immediate remedy." *Anilao v. Spota*, 27 F.4th 855, 863-64 (2d Cir. 2022)

(citing *Imbler v. Pachtman*, 424 U.S. 409, 427 (1976)). The Second Circuit has made clear that

"prosecutors enjoy 'absolute immunity from § 1983 liability for those prosecutorial activities

intimately associated with the judicial phase of the criminal process.'" *Id.* at 864 (quoting *Barr v. Abrams*, 810 F.2d 358, 361 (2d Cir. 1987)). "For example, a prosecutor enjoys absolute immunity when determining which offenses to charge, initiating a prosecution, presenting a case to a grand jury, and preparing for trial." *Id.* (citations omitted); *see also Imbler*, 424 U.S. at 431 (concluding that a prosecutor is absolutely immune from a Section 1983 suit for damages based on his "initiating a prosecution and . . . presenting the State's case"). The Second Circuit has held that "absolute immunity extends even to a prosecutor who 'conspir[es] to present false evidence at a criminal trial. The fact that such a conspiracy is certainly not something that is properly within the role of a prosecutor is immaterial, because the immunity attaches to his function, not to the manner in which he performed it.'" *Anilao*, 27 F.4th at 864 (quotation omitted).

Therefore, "'absolute immunity must be denied' only where there is both the absence of all authority (because, for example, no statute authorizes the prosecutor's conduct) and the absence of any doubt that the challenged action falls well outside the scope of prosecutorial authority." *Anilao*, 27 F.4th at 865 (quoting *Bernard v. Cnty of Suffolk*, 356 F.3d 495, 504 (2d Cir. 2004)). In most cases "the laws do authorize prosecution for the charged crimes," *Bernard*, 356 F.3d at 504, and if the charging decision or other act is within the prosecutor's jurisdiction as a judicial officer, then absolute immunity attaches to their actions "regardless of any allegations" that their "actions were undertaken with an improper state of mind or improper motive." *Shmueli v. City of New York*, 424 F.3d 231, 237 (2d Cir. 2005). "Prosecutors thus have absolute immunity in a § 1983 action even if it turns out that 'state law did not empower [them] to bring the charges,' so long as 'they have at least a semblance of jurisdiction' that does not run far afield of their job description." *Anilao*, 27 F.4th at 865 (quotation omitted). Ultimately, "unless a prosecutor proceeds in the clear absence of all jurisdiction, absolute immunity exists for those prosecutorial activities intimately

associated with the judicial phase of the criminal process. Conversely, where a prosecutor acts without any colorable claim of authority, he loses the absolute immunity he would otherwise enjoy." *Barr*, 810 F.2d at 361.

The Court's analysis concerning Defendants Korchak and Cornwell, as Milks' supervisors and the Broome County District Attorneys, differs from the analysis applicable to Defendant Milks. The Court will first address Plaintiff's claims against Korchak and Cornwell.

Plaintiff's allegations concerning Cornwell relate solely to Cornwell's supervision of Milks as the Broome County District Attorney. *See* Dkt. No. 1. at ¶¶ 98, 100. The parties agree that Cornwell was a member of the Broome County Multi-Disciplinary Team. *See* Dkt. No. 113-4 at ¶ 99. Cornwell described his relationship with Broome County Social Services as contentious. *See id.* at ¶ 105. He testified that he would have wanted to know if there were unfounded Social Services records concerning Plaintiff and/or K.S. *See id.* at ¶ 106. The parties also agree that Cornwell instituted a policy at the Broome County District Attorney's Office whereby charges should only be brought to a grand jury if there was evidence supporting the commission of a crime beyond a reasonable doubt. *See id.* at ¶ 125.

Supervising other attorneys can be categorized as prosecutorial or administrative. The Supreme Court has "conclude[d] that prosecutors involved in [certain kinds of] supervision or training or information-system management enjoy absolute immunity from the kind of legal claims at issue here. Those claims focus upon a certain kind of administrative obligation—a kind that itself is directly connected with the conduct of a trial." *Van de Kamp v. Goldstein*, 555 U.S. 335, 344 (2009). For example, the claims at issue in *Van de Kamp*, to which the Supreme Court applied absolute immunity, "require[d] legal knowledge and the exercise of related discretion, *e.g.*, in determining what information should be included in the training or the supervision or the

information-system management." *Id.* This is in contrast to "administrative duties concerning, for example, workplace hiring, payroll administration, the maintenance of physical facilities, and the like." *Id.*; *see also Bodie v. Morgenthau*, 342 F. Supp. 2d 193, 205 (S.D.N.Y. 2004) ("To the extent the supervision or policies concern the prosecutorial decisions for which the ADAs have absolute immunity, then those derivative allegations against supervisors must also be dismissed on the ground that the supervising district attorneys have absolute immunity for the prosecution-related decisions of their subordinates and because Section 1983 supervisory liability depends upon the existence of an underlying constitutional violation") (collecting cases).

Cornwell is entitled to absolute immunity for the actions taken in his capacity as Broome County District Attorney, supervising Milks' decisions in Plaintiff's criminal case. *See Bouchard v. Olmsted*, 775 Fed. Appx. 701, 704 (2d Cir. 2019) ("As the district court correctly held, suits challenging the training and supervision of prosecutors are barred by absolute prosecutorial immunity"). Likewise, Plaintiff alleges that Korchak, as the District Attorney, supervised Milks between January and December 2020. *See* Dkt. No. 1 at ¶ 101. He also contends that in June 2021, Korchak informed Plaintiff's attorney that the case against Plaintiff would be dismissed. *See id.* at ¶ 239. There are no other allegations concerning Korchak in Plaintiff's complaint and the Broome County Defendants do not discuss any material facts related to Korchak in its statement of material facts. *See* Dkt. Nos. 1, 107-2. Because Korchak's conduct relates to his actions taken in supervision of Milks in her prosecution of Plaintiff's criminal case and Korchak's own actions taken in Plaintiff's criminal case, the Court concludes that Korchak is entitled to absolute immunity.

As to the policy Cornwell promulgated in the District Attorney's Office requiring prosecutors to present cases to the grand jury only where they had evidence supporting

commission of the crime beyond a reasonable doubt, Cornwell is entitled to absolute immunity for such conduct. This is because such a policy does not relate to "administrative duties concerning, for example, workplace hiring, payroll administration, the maintenance of physical facilities, and the like." *Van de Kamp*, 555 U.S. at 344.

As to Defendant Milks, Plaintiff argues that Milks' conduct was investigative, and therefore, does not entitle her to absolute immunity. *See* Dkt. No. 107-1 at 15. Plaintiff contends that Milks' conduct was investigative because she interviewed K.S. prior to the case being presented the grand jury, an indictment being returned against Plaintiff, and Plaintiff being arrested. *See id.* at 15-16. Plaintiff notes that Milks scheduled the grand jury prior to ever speaking to K.S.; therefore, her conduct was an effort to manufacture evidence in the investigatory phase of the case. *See id.*

The Broome County Defendants assert that "there is no question that [the District Attorney's Office's] involvement in the prosecution of Plaintiff was solely in the role as a prosecutor on behalf of the State of New York." Dkt. No. 94-30 at 16. They argue that Milks "assessed and prepared the matter for grand jury, presented the case to the grand jury, and went forward with Plaintiff's prosecution until the time she left the District Attorney's Office." *Id.* at 17.

"'A prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity.'" *Giraldo v. Kessler*, 694 F.3d 161, 166 (2d Cir. 2012) (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993)). "'[A]ctions taken as an investigator enjoy only qualified immunity.'" *Id.* (quoting *Zahrey v. Coffey*, 221 F.3d 342, 346 (2d Cir. 2000)).

"Although all investigative activity could be considered in some sense to be 'prepar[ation] for the initiation of judicial proceedings,' the Supreme Court has sought to draw a line between those preparatory steps that a prosecutor takes to be an effective advocate of a case *already assembled* and those investigative steps *taken to gather evidence*." *Smith v. Garretto*, 147 F.3d 91, 94 (2d Cir. 1998) (quoting *Buckley*, 509 U.S. at 273) (emphasis added). The Supreme Court "has identified 'evaluating evidence and interviewing witnesses' as falling on the absolute immunity side of the line, leaving 'searching for the clues and corroboration' that might lead to a recommendation for an arrest on the qualified immunity side." *Id.* at 94 (quoting *Buckley*, 509 U.S. at 273).

"It is well-settled that '[t]he decision to initiate prosecution, what charges to bring, and how to perfect and consolidate those charges is a quintessential prosecutorial function.'" *Vann v. City of Rochester*, No. 6:18-CV-06464, 2019 WL 2646616, *3 (W.D.N.Y. June 27, 2019) (quoting *Ogunkoya v. Monaghan*, 913 F.3d 64, 71 (2d Cir. 2019)); *see also Williams v. City of N.Y.*, No. 06-CV-6601, 2009 WL 3254465, *10 (E.D.N.Y. Oct. 9, 2009) ("[E]valuating evidence and deciding whether to initiate a prosecution are exactly the sort of actions for which absolute immunity shields prosecutors from liability"); *Bhatia v. Gaetano*, No. 06-CV-1771, 2008 WL 901491, *3 (D. Conn. Mar. 31, 2008) (finding that the prosecutor's decision to institute a criminal prosecution "after considering the weight of evidence in the case" was protected by absolute immunity, despite the prosecutor's knowledge of evidence that witnesses were lying); *Damon v. New York*, No. 8:23-CV-74, 2023 WL 11965130, *9 (N.D.N.Y. Mar. 28, 2023) (applying absolute immunity to prosecutor's conduct "such as speaking with the victim, opposing bail, plea bargaining, seeking extensions of time for hearings and trial, and presenting evidence to a grand jury" where the alleged victim was interviewed alone by an investigator and assistant district

attorney); *Soto v. City of New York*, 132 F. Supp. 3d 424, 441 (E.D.N.Y. 2015) (noting that some of the prosecutor's conduct such as interviewing a witness was a prosecutorial function).

For example, if the decision to seek indictment has already been made, the prosecutor may be engaging in prosecutorial functions. *See Bertuglia v. City of New York*, 133 F. Supp. 3d 608, 647 (S.D.N.Y. 2015), *aff'd sub nom. Bertuglia v. Schaffler*, 672 Fed. Appx. 96 (2d Cir. 2016) ("[T]hat conduct—interviewing potential grand jury witnesses—is plainly within the power of a prosecutor, and is protected by absolute immunity") (quoting *Bertuglia v. City of New York*, 839 F. Supp. 2d 703, 732-33 (S.D.N.Y. 2012)).

However, where a prosecutor has engaged in interviews and evidence gathering prior to an arrest, courts have concluded that such conduct is investigative. *See Kellner v. City of New York*, No. 17-CV-1268, 2021 WL 4251343, *8 (E.D.N.Y. Sept. 17, 2021) (declining to extend absolute immunity to a "decision to exclude the Sex Crimes Bureau and [a detective] from the investigation" after Plaintiff informed those individuals of alleged harassment and intimidation; and to a decision to "counsel[] the [] family on what evidence to obtain against Plaintiff" because the "actions [] were part of the evidence-gathering process before Plaintiff's arrest"); *Kanciper v. Lato*, 989 F. Supp. 2d 216, 229 (E.D.N.Y. 2013) (concluding that an attorney's conduct was not entitled to absolute immunity because "this was not a traditional scenario where the police accumulate the evidence after which the District Attorney's Office presents it to the grand jury. Here, neither the police nor CPS were involved.  In fact, the District Attorney's Office previously declined to investigate the Plaintiff.  Indeed, because the case was closed at the time Lato assigned the investigation to himself").

Even still, "not every interview, interrogation, or other act by a prosecutor with the potential of revealing new information is an investigative act entitled to only qualified immunity."

*Id.* "Good prosecutors may—usually should—perform acts reasonably characterized as investigative at all phases of a criminal proceeding. The investigative acts that are entitled to only qualified immunity are those undertaken in the phase of law enforcement that involves the gathering and piecing together of evidence for indications of criminal activities and determination of the perpetrators." *Id.* "In contrast, investigative acts reasonably related to decisions whether or not to begin or to carry on a particular criminal prosecution, or to defend a conviction, are shielded by absolute immunity when done by prosecutors." *Id.* "To be sure, as the Supreme Court cautioned in *Buckley*, even the presence of probable cause 'does not guarantee a prosecutor absolute immunity from liability for all actions taken afterwards.'" *Id.* (quoting *Buckley*, 509 U.S. at 274 n.5). Such acts are shielded by absolute immunity only when they are of a kind reasonably related to the ordinary functions of a prosecutor with such probable cause." *Id.* at 166-67.

This case presents an extremely close call. However, the Court cannot conclude as a matter of law that Milks' conduct was prosecutorial because there is evidence that she took actions in an effort to develop information and "'corroboration' that might lead to a recommendation for an arrest . . . ." *Smith*, 147 F.3d at 94.

The Broome County Defendants disagree and compare the facts of this case to those underlying the Second Circuit's decision in *Giraldo*. *See* Dkt. No. 94-30 at 17. In *Giraldo*, the victim of an alleged domestic violence incident was interviewed by assistant district attorneys, for which the Second Circuit extended absolute prosecutorial immunity. *See Giraldo*, 694 F.3d at 164. The victim told the attorneys "that she did not want to talk, but that they nevertheless continued to interrogate her. After two hours of interrogation by [the attorneys], [she] was released." *Id.* The alleged victim said that her injuries were an "accident." *Id.* The interview occurred after her alleged abuser had been arrested. *See id.* That same day, the alleged abuser

was arraigned and bail was posted.  *See id.*  The Second Circuit held that the assistant district

attorneys action "were well within their legitimate functions as prosecutors."  *Id.* at 167.  The

Second Circuit noted that the alleged abuser "had been arrested prior to [the] interview . . . .  Once

the arrest took place, legal decisions at the core of the prosecutorial function—pursuit of the

charges, arraignment, bail, etc.—had to be made by appellants and made quickly. The interview

of appellee was clearly in a 'pending or in preparation [of] a court proceeding in which the

prosecutor acts as an advocate.'"  *Id.* (quoting *Warney v. Monroe Cnty*, 587 F.3d 113, 123 (2d Cir.

2009)).  The Second Circuit stated that "[a] reasonable prosecutor easily could—should—have

viewed a first-hand interview and personal weighing of the credibility of [the alleged victim's]

self-propelled-shattering-glass story as necessary.  While questioning an important witness may

accurately be described as investigative, [the attorneys'] interview was an integral part of [their]

advocatory function as prosecutors protected by absolute immunity."  *Id.*

 Here, there is an important distinction which leads the Court to the opposite conclusion as

that found in *Giraldo*—Plaintiff was not arrested at the time of Milks' interviews of K.S.  It is true

that Milks made the decision to schedule a grand jury prior to ever meeting K.S., and presentation

to a grand jury is clearly a prosecutorial function.  However, at that time, the only evidence that

existed in the case was K.S.'s single forensic interview.  No one knew where Plaintiff lived at that

point, and Plaintiff had not yet been interviewed by police, let alone arrested.  *See* Dkt. No. 114-1

at ¶¶ 195-207 (noting that Milks met with K.S. on June 11, July 25, and July 26, 2019; and on

July 26, 2019, Milks asked McEwan "to attempt to make contact with" Plaintiff).

 The stage of the case at which Milks interviewed K.S. was the phase of "'searching for the

clues and corroboration' that might lead to a recommendation for an arrest . . . .'"  *Smith*, 147 F.3d

at 94 (quotation omitted).  Although Milks' actions may have been taken in preparation of a grand

jury presentment, "the Supreme Court has pointed out, '[a]lmost any action by a prosecutor, including his or her direct participation in purely investigative activity, could be said to be in some way related to the ultimate decision whether to prosecute,' but absolute immunity is not so expansive." *Kanciper*, 989 F. Supp. 2d at 230 (quoting *Burns v. Reed*, 500 U.S. 478, 495 (1991)). It is true that "[i]f a prosecutor never interviewed a witness before a grand jury, he [or she] would have limited information on what the witness actually knew or on what questions he [or she] should ask to assist the grand jury in its deliberations." *Tabaei v. New York City Health & Hosps. Corp.*, No. 11-CV-2013, 2011 WL 6778500, *4 (S.D.N.Y. Dec. 21, 2011). However, absolute "immunity does not protect efforts to manufacture evidence that occur during the investigatory phase of a criminal case. . . [or] to collect or corroborate evidence . . . in order to get probable cause . . . ." *Hill v. City of New York*, 45 F.3d 653, 662 (2d Cir. 1995); *see also Buckley*, 509 U.S. at 274 (concluding that the prosecutors were acting as investigators instead of advocates "during the period before they convened a special grand jury to investigate the crime provides the answer . . . . The prosecutors do not contend that they had probable cause to arrest petitioner or to initiate judicial proceedings during that period. Their mission at that time was entirely investigative in character").

There is a question of fact as to whether probable cause for Plaintiff's arrest existed at the time of Milks' interviews of K.S. At that time, the sole evidence of a crime was K.S.'s forensic interview, and during that interview, K.S. identified someone other than Plaintiff as sexually abusing her prior to Plaintiff and when K.S. was four years old. *See* Dkt. No. 114-1 at ¶ 123. Then, in the first meeting between McEwan, Milks, and K.S., she was so uncomfortable, they "didn't go into any real details of anything," and, in their first formal interview, K.S. denied any penetration occurred. *Id.* at ¶¶ 196, 198.

"In the Second Circuit, '[i]t is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness, unless the circumstances raise doubt as to the person's veracity.'" *Simuro v. Shedd*, 176 F. Supp. 3d 358, 377 (D. Vt. 2016) (quoting *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006)). "[M]any courts have recognized, police officers must exercise extreme caution in crediting the statements of young children." *Id.* (collecting cases). "In fact, as the Sixth Circuit recently acknowledged, 'it appears that no federal court of appeals has ever found probable cause based on a child's allegations absent some other evidence to corroborate the child's story.'" *Id.* (quoting *Wesley v. Campbell*, 779 F.3d 421, 430 (6th Cir. 2015)).

Because Plaintiff was not yet located, interviewed, or arrested, and there are questions of fact as to whether probable cause existed prior to Milks' presentation of the case to the grand jury given K.S.'s inconsistent statements, the Court concludes that Milks' conduct was investigative and not prosecutorial. The Court, therefore, cannot conclude as a matter of law that all of Milks' conduct entitles her to absolute immunity, and this aspect of the Broome County Defendants' motion is denied.

### 4. Fourth Amendment False Arrest and Imprisonment

All of the Defendants argue that Plaintiff's false arrest and false imprisonment claim must fail because Plaintiff's arrest and imprisonment were based on probable cause. *See* Dkt. No. 85-36 at 22-28; Dkt. No. 94-30 at 41-43. Plaintiff argues there was an absence of probable cause; therefore, his arrest was impermissible. *See* Dkt. No. 108-1 at 22-26; Dkt. No. 107-1 at 48-50.

"The common law tort of false arrest is a species of false imprisonment." *Weyant v. Okst*, 101 F.3d 845, 853 (2d Cir. 1996) (quoting *Singer v. Fulton County Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995)). "The elements of a claim of false arrest under § 1983 are substantially the same as

the elements of a false arrest claim under New York law." *Hygh v. Jacobs*, 961 F.2d 359, 366 (2d Cir. 1992) (quotation marks and citation omitted).

To prevail on a false arrest claim under New York law, a plaintiff has to prove the following: "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Singer*, 63 F.3d at 118 (alteration and quotation marks omitted) (quoting *Broughton v. State*, 37 N.Y.2d 451, 456 (1975)); *see also Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) (outlining the elements of false arrest claims). "The existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest.'" *Weyant*, 101 F.3d at 852 (quoting *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)); *see also Ackerson*, 702 F.3d at 19-20 (citing *Weyant*, 101 F.3d at 852). "A police officer has probable cause for an arrest when he has 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime[.]'" *Swartz v. Insogna*, 704 F.3d 105, 111 (2d Cir. 2013) (quoting *Weyant*, 101 F.3d at 852); see also *Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013). Such knowledge or information can be based on information provided by an eyewitness, unless the circumstances would raise a doubt as to the eyewitness' veracity. *See Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) (citing *Singer*, 63 F.3d at 119). The question is whether the facts known to the arresting officer, at the time of the arrest, objectively provided probable cause to support the arrest. *See Gonzalez*, 728 F.3d at 155.

The Endicott Defendants argue, first, that McEwan was not involved in Plaintiff's arrest such that McEwan cannot be held liable for a false arrest claim. *See* Dkt. No. 85-36 at 23-24.

Specifically, the Endicott Defendants contend McEwan's interview of Plaintiff did not constitute a seizure and McEwan did not physically arrest Plaintiff.  *See id.*

Plaintiff asserts that McEwan, Milks, and the Broome County District Attorney's Office were personally involved in his arrest because "[a] June 2020 Milks emails with Assistant Chief Craig Williams and Detective Rossi show how Milks and the Endicott Police Department manipulated the Grand Jury and warrant procedures in order to have the County Sheriff foot the bill for the ultimate arrest." Dkt. No. 107-1 at 49.  Plaintiff does not present any case law to support his theory.  Plaintiff also contradicts himself in his filings.  In his response to the Endicott Defendants' motion, he relies on a June 2020 e-mail to support his argument.  *See* Dkt. No. 107-1 at 49.  However, in his response to the Broome County Defendants' motion, Plaintiff acknowledges that in making the probable cause determination, "what is necessary is a review of facts available to police and the prosecutor when obtaining their indictment, thus achieving probable cause for Plaintiff [sic] wrongful arrest."  Dkt. No. 108-1 at 22-23.

"[F]acts gleaned after an arrest are not material to Plaintiff's false arrest claims because they cannot supply or defeat probable cause as that determination must be based upon the facts known or knowable at the time of the arrest."  *Harig v. City of Buffalo*, 574 F. Supp. 3d 163, 189 (W.D.N.Y. 2021), *aff'd*, No. 22-30-CV, 2023 WL 3579367 (2d Cir. May 22, 2023) (citing *Florida v. Harris*, 568 U.S. 237, 249 (2013)); *see also Espada v. Schneider*, 522 F. Supp. 2d 544, 552 (S.D.N.Y. 2007) ("The probable cause inquiry focuses on the information available to the officer at the time of arrest; an officer's subjective intent is irrelevant") (citing *Devenpeck v. Alford*, 543 U.S. 146, 152-53 (2004)).

Because the June 2020 e-mail concerns a completely different criminal case and was not known at the time of Plaintiff's arrest, the Court will not consider it in determining whether there was probable cause for Plaintiff's arrest.

As to McEwan's personal involvement, Plaintiff agrees that he was arrested and detained by U.S. Marshals. *See* Dkt. No. 114-1 at ¶ 301. The parties admit that Plaintiff was not arrested by any Endicott Police Officers. *See id.* at ¶ 302. That does not, however, end the personal involvement inquiry.

"[A] police officer can only be liable for a false arrest that occurs outside of his presence if he 'had reason to know' that such a false arrest was likely to occur." *Escalera v. Lunn*, 361 F.3d 737, 748 n.4 (2d Cir. 2004) (citing *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)). For example, "[a] defendant officer may be found to be personally involved in a false arrest if the officer 'personally participated in the events that constitute the basis for the alleged probable cause asserted by defendants as a defense to the false arrest charges against them.'" *Bianco v. Cnty. of Nassau*, No. 16-CV-444, 2018 WL 1175157, *7 (E.D.N.Y. Mar. 6, 2018) (quoting *Rasin v. City of New York*, No. 14-CV-5771, 2016 WL 2596038, *9 (E.D.N.Y. 2016)).

"Similarly, an officer's alleged involvement in an investigation may sufficiently establish an officer's liability in a false arrest claim." *Id.* (citing *Gomez v. City of New York*, No. 16-CV-1274, 2017 WL 1034690, *7 (E.D.N.Y. 2017)); see *also Gomez v. City of New York*, No. 16-CV-1274, 2017 WL 1034690, *7 (E.D.N.Y. Mar. 16, 2017) ("The court finds, however, that Defendant Eberhardt's alleged involvement in the investigation and photo array that led to Plaintiff's arrest are sufficient to establish false arrest liability under Section 1983"); *Alvarez v. Cnty. of Orange, N.Y.*, 95 F. Supp. 3d 385, 400 n.1 (S.D.N.Y. 2015) ("The Court finds that these allegations 'rise to the requisite level of personal involvement necessary to state a claim for false

arrest,' . . . as Plaintiff alleges that Cottone directly participated in the investigation, directed the investigation, and instructed Carpentier to arrest Plaintiff") (internal quotation omitted).

There is no dispute that McEwan was the investigating officer in Plaintiff's criminal case. McEwan also testified before the grand jury the on the same day that the indictment was returned, and the arrest warrant was issued. *See* Dkt. No. 114-1 at ¶¶ 278, 300. Although the parties agree that McEwan "was unaware of the sealed felony indictment until he later became aware that Plaintiff was arrested in Tennessee," neither party explains when McEwan became aware of the arrest warrant or who instructed the U.S. Marshals in Tennessee to detain Plaintiff. *Id.* at ¶ 303. McEwan was the officer who earlier traveled to Tennessee to interview Plaintiff. *See id.* at ¶¶ 211-12. Because neither party disputes that McEwan was the investigating officer in Plaintiff's case which led to Plaintiff's arrest, McEwan's personal involvement has been sufficiently established such that the Court will analyze the merits of Plaintiff's false arrest claim.

Plaintiff argues that "in this case the warrant presumption is a red herring as the ultimate question is simply whether probable cause existed for Plaintiff's arrest. In that case, what is necessary is a review of facts available to police and the prosecutor when obtaining their indictment, thus achieving probable cause for Plaintiff wrongful arrest." Dkt. No. 108-1 at 22-23.

Plaintiff is incorrect. "[A]n arrest 'pursuant to a warrant issued by a neutral magistrate is presumed reasonable because such warrants may issue only upon a showing of probable cause.'" *May v. Levy*, 659 F. Supp. 3d 323, 336 (E.D.N.Y. 2023) (quoting *Walczyk v. Rio*, 496 F.3d 139, 155-56 (2d Cir. 2007)). "To rebut probable cause, a plaintiff must show that a warrant was obtained by fraud or is facially invalid." *Id.* (citing *Johnson v. Dobry*, 660 Fed. Appx. 69, 71 (2d Cir. 2016)); *see also Briggs v. Casey*, No. 1:22-CV-1221, 2024 WL 1913038, *3 (N.D.N.Y. May 1, 2024) ("The issuance of an arrest warrant alone, 'which depends on a finding of probable cause,

creates a presumption that it was objectively reasonable for the officers to believe that there was probable cause'") (quoting *Washington v. Napolitano*, 29 F.4th 93, 105 (2d Cir. 2022)).

Therefore, because Plaintiff's arrest was made pursuant to a warrant issued by Broome County Court Judge Joseph F. Cawley, there is a presumption of probable cause for Plaintiff's arrest. See *Dkt*. No. 114-1 at ¶¶ 300-01.

Plaintiff has not presented evidence that the warrant was obtained by fraud or was facially invalid. Rather, it was procured through presentation of an indictment which was returned after the case was presented to a grand jury. *See id.* at ¶ 300. During the grand jury proceeding, Milks acknowledged that the grand jury was required to determine whether to return an indictment based on what K.S. testified. *See* Sealed Dkt. No. 85-26 at 74-75. McEwan informed the grand jury that Plaintiff denied any inappropriate touching of K.S. *See id.* at 62.

"[A] suspect's 'denials are insufficient to obviate probable cause.'" *Weiner v. McKeefery*, 90 F. Supp. 3d 17, 31-32 (E.D.N.Y. 2015) (quoting *Castro v. County of Nassau*, 739 F. Supp. 2d 153 (E.D.N.Y. 2010)). "The Second Circuit has held that [t]he fact that an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause,' and an officer's failure to investigate an arrestee's protestations of innocence generally does not vitiate probable cause." *Id.* (quoting *Panetta v. Crowley*, 460 F.3d 388, 395-96 (2d Cir. 2006)). (additional quotation and quotation marks omitted). "Furthermore, in *Curley v. Village of Suffern*, the Second Circuit held that, when an alleged victim of assault told police that the plaintiff was the perpetrator, police had probable cause to arrest, even though the plaintiff had a conflicting account." *Id.* (citing *Curley v. Village of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001)).

Plaintiff, therefore, fails to rebut the presumption of probable cause established by a neutral judge issuing a warrant for Plaintiff's arrest. As such, his false arrest claim must fail.

However, the Court's determination that there was probable cause for Plaintiff's arrest does not end the Court's Fourth Amendment inquiry.  Plaintiff argues that he was wrongfully detained for two years because Milks and McEwan failed to obtain the unfounded CPS reports which showed a history of K.S. lying and making up information.  *See* Dkt. No. 108-1 at 16-17.

The Second Circuit in *Russo v. City of Bridgeport*, 479 F.3d 196, 205 (2d Cir. 2007) recognized a distinct claim from false arrest—a claim for an "unreasonably prolonged detention." "To prevail on an excessive-detention, or *Russo*, claim, a plaintiff 'must establish (1) that he has a right to be free from continued detention stemming from law enforcement officials' mishandling or suppression of exculpatory evidence, (2) that the actions of the officers violated that right, and (3) that the officers' conduct "shocks the conscience."'"  *Taylor v. City of New York*, No. 18-CV-5500, 2021 WL 848966, *6 (E.D.N.Y. Mar. 4, 2021) (quoting Russo, 479 F.3d at 205); *see also Jackson v. City of New York*, 29 F. Supp. 3d 161, 178-79 (E.D.N.Y. 2014); *Goodson v. Zion*, No. 18-CV-7370, 2018 WL 11265505, *2 (S.D.N.Y. Oct. 2, 2018).  "Courts following *Russo* have determined that 'Russo indicated that the touchstone [of an unreasonably prolonged detention claim] is whether the defendants' actions were objectively reasonable under the circumstances.'" *Gonzalez v. New York City,* No. 16-CV-00254, 2016 WL 7188147, *4 (S.D.N.Y. Dec. 2, 2016) (quoting *Gallimore v. Feliciano*, No. 14-CV-1519, 2015 WL 3856694, *8 (S.D.N.Y. June 19, 2015)).

As of March 2024, and "[s]ince *Russo*, the Second Circuit has considered the legal sufficiency of claims for unreasonably prolonged pretrial detention in six cases.  In all six, the claim failed."  *Horn v. City of New Haven*, No. 3:18-CV-1502, 2024 WL 1261421, *12 n.8 (D. Conn. Mar. 19, 2024) (explaining the factor under which each of the six cases failed).  However, "[i]n accordance with the holding in *Russo*, district courts in the Second Circuit have recognized

that to recover damages for unreasonably prolonged detention, the plaintiff must prove that he would have been released were it not for the defendant's conscience-shocking mishandling of highly significant evidence of the plaintiffs' actual innocence." *Id.* at *13.

Plaintiff has not presented evidence that McEwan or Milks engaged in conscience shocking mishandling of evidence which showed Plaintiff's *actual innocence*. As explained, McEwan never obtained any unfounded CPS reports concerning K.S. or Plaintiff. *See* Dkt. No. 114-1 at ¶ 166. Although Milks obtained additional CPS records in April 2020, McEwan had ceased involvement in the case in March 2020. *See id.* at ¶¶ 311-12. Plaintiff has not established that McEwan can be liable for an unreasonably prolonged detention claim where he has failed to present evidence that McEwan engaged in conduct that shocks the conscience and was indicative of Plaintiff's innocence. As to Milks, there is nothing in the CPS records related to K.S.'s allegations underlying Plaintiff's criminal case. It is well-documented that K.S. had a history of lying, but this concerns K.S.'s credibility and does not establish as a matter of law that Plaintiff was actually innocent, and that Milks ignored his innocence.

Further, "[w]hile courts have recognized that probable cause can 'dissipate' over time, [in the context of malicious prosecution claims] '[t]he Second Circuit has not addressed the issue of whether an officer can be liable for false imprisonment if, after a lawful arrest, probable cause dissipates and the suspect is not released from custody.'" *DeBruin v. Macedon Police Dep't,* 456 F. Supp. 3d 518, 523-24 (W.D.N.Y. 2020) (quoting *Walker v. City of New York*, No. 15-CV-500, 2017 WL 2799159, *5 n.5 (E.D.N.Y. June 27, 2017); *see also M.C. v. Cnty. of Westchester, New York*, No. 16-CV-3013, 2020 WL 7481023, *24 (S.D.N.Y. Dec. 18, 2020) (explaining the same). The Second Circuit has declined to decide "whether an officer may, in an extreme case, be required to release a detainee arrested without a warrant where probable cause has unequivocally

dissipated, rendering further detention prior to the magistrate's determination unreasonable." *United States v. Pabon*, 871 F.3d 164, 177 (2d Cir. 2017) (explaining that "the Supreme Court has never indicated that the police have a specific Fourth Amendment obligation in the aftermath of a warrantless arrest continually to reevaluate whether the available evidence still definitively supports the initial probable cause determination").

Even if such a claim was cognizable, it is undisputed that McEwan was no longer involved in Plaintiff's case after Milks informed McEwan that he was not needed for a *Huntley* hearing. *See* Dkt. No. 114-1 at ¶¶ 311-12. McEwan had absolutely no knowledge of any of the information that would have dissipated probable cause. It is a fundamental principle of § 1983 liability that a defendant must have personal involvement in the alleged constitutionally violative conduct. *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994). As such, even if the Second Circuit recognized a claim against a police officer for failing to release a detainee based on learning new information that dissipates probable cause, such a claim cannot withstand summary judgment against McEwan because of his lack of personal involvement in the case during Plaintiff's two-year incarceration.

Likewise, even where the Second Circuit has permitted malicious prosecution claims to proceed based on a theory of dissipated probable cause, "the groundless nature of the charges must be made apparent by the discovery of some intervening fact. . . . The New York Court of Appeals has noted that 'the failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause.'" *Lowth*, 82 F.3d at 571 (citation and quotation omitted). McEwan did not discover any intervening facts. He was no longer involved in the case; therefore, he did not have any indication that further inquiry was necessary.

Finally, as to Defendant McEwan, the Endicott Defendants argue that any of Plaintiff's claims related to McEwan's grand jury testimony must be dismissed because McEwan is entitled to absolute immunity for that testimony. *See* Dkt. No. 85-36 at 41.

"When a police officer claims absolute immunity for his grand jury testimony under [the Supreme Court's decision in] *Rehberg*, the court should determine whether the plaintiff can make out the elements of his § 1983 claim without resorting to the grand jury testimony." *Coggins v. Buonora*, 776 F.3d 108, 113 (2d Cir. 2015) (citing *Rehberg v. Paulk*, 566 U.S. 356, 368-69 (2012)). "If the claim exists independently of the grand jury testimony, it is not 'based on' that testimony, as that term is used in *Rehberg*. Conversely, if the claim requires the grand jury testimony, the defendant enjoys absolute immunity under *Rehberg*." *Id.* (citation omitted).

To the extent Plaintiff's claims against McEwan do not relate solely to McEwan's grand jury testimony, including his investigation into Plaintiff's case and the alleged failure to seek additional DSS records indicating K.S.'s propensity for lying, McEwan is not entitled to absolute immunity. *See O'Neal v. City of New York*, 196 F. Supp. 3d 421, 430 (S.D.N.Y. 2016), *aff'd sub nom. O'Neal v. Morales*, 679 Fed. Appx. 16 (2d Cir. 2017) ("Preparatory activity includes for example, "preliminary discussion in which the witness relates the substance of his intended testimony"') (quotation omitted). However, for the reasons already set forth, those additional claims against McEwan fail on the merits. Accordingly, the Endicott Defendants' motion is granted as to the Fourth Amendment claims against Defendant McEwan.

### 5. *Malicious Prosecution Claim*

Although the Court concluded that Milks is not entitled to absolute prosecutorial immunity for her investigative conduct taken prior to Plaintiff's arrest and prosecution, it is well settled that a prosecutor is entitled to absolute immunity "for those prosecutorial activities

intimately associated with the judicial phase of the criminal process.'" *Anilao*, 27 F.4th at 864

(quoting *Barr*, 810 F.2d at 361) (footnote omitted). Milks' conduct in presenting the case to the

grand jury, obtaining an indictment, responding to defense counsel's request for a bill of

particulars, and seeking additional CPS records as prompted by defense counsel, are all actions

intimately associated with the judicial phase of the criminal prosecution. *See* Sealed Dkt. Nos.

103-4–103-8. Therefore, the malicious prosecution claim against Milks cannot proceed because

she is entitled to absolutely prosecutorial immunity taken in Plaintiff's case between July 26,

2019—when she began presenting the case to the grand jury—and January 20, 2021—when she

left the office. *See* Dkt. No. 114-1 at ¶¶ 237, 318. This aspect of the Broome County Defendants'

motion must be granted.

Even if absolute prosecutorial immunity did not apply, the malicious prosecution claim

against Defendant Milks would necessarily be dismissed because there was probable cause to

support Plaintiff's initial prosecution. "To state a claim for malicious prosecution, a plaintiff must

allege (i) the initiation or continuation of a criminal proceeding against the plaintiff, (ii)

termination of the proceeding in the plaintiff's favor, (iii) a lack of probable cause for

commencing the proceeding, and (iv) actual malice as a motivation for the defendant's actions."

*Bornschein v. Herman*, 304 F. Supp. 3d 296, 301-02 (N.D.N.Y. 2018) (citing *Ying Li v. City of

New York*, 246 F. Supp. 3d 578, 604 (E.D.N.Y. 2017)).

"Because lack of probable cause is an element of a malicious prosecution claim, 'the

existence of probable cause is a complete defense to a claim of malicious prosecution.'"

*Stansbury v. Wertman*, 721 F.3d 84, 94-95 (2d Cir. 2013) (quoting *Manganiello v. City of New

York*, 612 F.3d 149, 161-62 (2d Cir. 2010)). "The presumption of probable cause established by a

grand jury indictment 'may be rebutted . . . by evidence that the indictment was procured by fraud,

perjury, the suppression of evidence or other police conduct undertaken in bad faith.' . . .
However, once probable cause has been established, it is impossible for plaintiff to prevail on a
malicious prosecution claim as a matter of law." *Id.* at 95. "The probable cause standard in the
malicious prosecution context is slightly higher than the standard for false arrest cases. . . .
'Probable cause, in the context of malicious prosecution, has also been described as such facts and
circumstances as would lead a reasonably prudent person to believe the plaintiff guilty.'" *Id.*
(quoting *Boyd v. City of New York*, 336 F.3d 72, 74, 76 (2d Cir. 2003)).

    "Despite the distinction between probable cause to arrest and probable cause to prosecute,
where 'probable cause to arrest exist[s] . . . [and there are no] intervening facts between arrest and
initiation of prosecution to undermine that probable cause, claims of malicious prosecution cannot
survive.'" *Caraballo v. City of New York*, 726 F. Supp. 3d 140, 160 (E.D.N.Y. 2024) (quoting
*Powell v. Murphy*, 593 Fed. App'x 25, 28 (2d Cir. 2014)). "In addition to intervening facts or
newly discovered evidence, an officer's 'failure to make further inquiry when a reasonable person
would have done so may be evidence of lack of probable cause.'" *Id.* (quoting *Lowth*, 82 F.3d at
571). "For example, an officer's failure to examine evidence already available to him may lead
probable cause that existed at arrest to dissipate prior to the commencement of the prosecution."
*Id.* (citing *Weiner*, 90 F. Supp. 3d at 34).

    "'[A] lack of probable cause generally creates an inference of malice.'" *Manganiello*, 612
F.3d at 163 (quotation omitted). "'[M]alice may be shown by proving that the prosecution
complained of was undertaken from improper or wrongful motives, or in reckless disregard of the
rights of the plaintiff.'" *Id.* (quoting *Pinsky v. Duncan*, 79 F.3d 306, 313 (2d Cir. 1996)); *see also*
*Lowth*, 82 F.3d at 573 ("Under New York law, malice does not have to be actual spite or hatred,
but means only 'that the defendant must have commenced the criminal proceeding due to a wrong

or improper motive, something other than a desire to see the ends of justice served'") (quotation omitted).

"[A] prosecutor is not required to present to the grand jury exculpatory evidence." *Horton v. Ercole*, 557 F. Supp. 2d 308, 330 (N.D.N.Y. 2008) (citing *United States v. Williams*, 504 U.S. 36, 55 (1992)); *see also Hunter v. Annucci*, No. 19-CV-1321, 2023 WL 3179698, *15 (E.D.N.Y. May 1, 2023), *aff'd*, No. 23-6632, 2025 WL 481526 (2d Cir. Feb. 13, 2025); *Morse v. Fusto*, 804 F.3d 538, 547 (2d Cir. 2015) ("'[T]he suspect under investigation by the grand jury [has never] been thought to have a right to testify or to have exculpatory evidence presented'").

However, "[n]otwithstanding the legally permissible one-sided nature of grand jury proceedings, everyone possesses the additional and distinct 'right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity.'" *Morse*, 804 F.3d at 547 (quoting *Zahrey*, 221 F.3d at 349). "'[F]alse information likely to influence a jury's decision . . . violates the accused's constitutional right to a fair trial,' because to hold otherwise, 'works an unacceptable "corruption of the truth-seeking function of the trial process."'" *Id.* at 548 (quoting *Ricciuti*, 124 F.3d at 130). "Information may be 'false' if material omissions render an otherwise true statement false." *Id.*

Plaintiff has not identified any grand jury testimony that was "false." Insofar as the parties agree that K.S. provided inconsistent statements during one of her interviews with McEwan and Milks, the failure to present this inconsistency to the grand jury does not make the testimony "false." This is particularly true when K.S. made numerous other, consistent, statements concerning the alleged abuse. *See O'Brien v. City of Yonkers*, No. 07-CV-3974, 2013 WL 1234966, *15 (S.D.N.Y. Mar. 22, 2013) ("Defendant Chiarella's omission of his report, which noted that Neal stated that he 'would probably not be able to identify' his attacker, or of Neal's

initial reluctance to cooperate, were not egregious omissions considering Neal's subsequent, repeated identifications of Plaintiff"); *Burgess v. DeJoseph*, No. 5:14-CV-1371, 2017 WL 1066662, *6 (N.D.N.Y. Mar. 21, 2017), *aff'd*, 725 Fed. Appx. 36 (2d Cir. 2018) ("[T]he omission of Officer O'Brien's report 'does not rise to the level of egregious deviations from statutory requirements or accepted practices required to overcome the grand jury presumption,' . . . because the fact that some witnesses 'did not identify [P]laintiff does not vitiate the probable cause that resulted from the identifications by [Pridgen and Grady]'").

Importantly, insofar as Plaintiff's indictment was later dismissed, "dismissals of indictments based on insufficient evidence for the prosecution to make out a prima facie case do not vitiate the presumption of probable cause from a grand jury indictment." *Bertuglia v. City of New York*, 133 F. Supp. 3d 608, 626 (S.D.N.Y. 2015), *aff'd sub nom. Bertuglia v. Schaffler*, 672 Fed. Appx. 96 (2d Cir. 2016); *see also Galgano v. Cnty. of Putnam, New York*, No. 16-CV-3572, 2024 WL 1623401, *94 (S.D.N.Y. Apr. 15, 2024) ("New York courts have generally recognized that dismissal of an indictment does not negate the presumption of probable cause") (collecting cases). Based on the foregoing, there was probable cause to support Plaintiff's initial prosecution.[6]

An issue then arises about whether Plaintiff can succeed on a malicious prosecution claim because of his two-year imprisonment. A malicious prosecution claim concerns not only the initiation of a prosecution, but also the "continuation of a criminal proceeding against plaintiff . . . ." *Manganiello*, 612 F.3d at 161 (quotation and quotation marks omitted).

---

[6] Because the Court concludes that Milks is entitled to absolute immunity for her conduct in prosecuting Plaintiff's case and, in the alternative, that there was probable cause to support the initial prosecution, the Court need not address the favorable termination or actual malice prongs of a malicious prosecution claim.

The Court cannot conclude as a matter of law that probable cause remained throughout Plaintiff's two-year imprisonment and prosecution. For example, McEwan's investigative file, which was provided to Milks on August 30, 2019, states that on December 27, 2018, Ames told McEwan "there is a history of [Plaintiff] and [K.S.] in CPS. . . . [R.O.] has contacted CPS on multiple occasions for reports of domestic abuse by [Plaintiff]. Refer also to CPS reports." Sealed Dkt. No. 117 at 5. McEwan's investigative file also reiterated Ames's statement that K.S. had disclosed the alleged sexual conduct during a physical examination in August or September 2018. *See* Dkt. No. 114-1 at ¶ 131. Yet, no one attempted to speak with that doctor. Similarly, R.O. told McEwan "that she 'had a feeling that [Plaintiff] may have done something to [K.S.],' and that she talked to her mother and grandmother about it." *Id.* at ¶ 161. No one ever confirmed this with R.O.'s grandmother. Additionally, Milks was aware from the investigative file as well as her interviews with K.S. that K.S. alleged the abuse occurred for five-to-seven years, but Plaintiff only knew K.S. between around March 2013 and November 2017. *See* Sealed Dkt. No. 117 at 155.

Between August 30, 2019, when Milks received McEwan's investigative file, and March 13, 2020, when McEwan decided to forego a *Huntley* hearing, there is no evidence that Milks did anything related to Plaintiff's case. *See* Dkt. No. 114-1 at ¶¶ 310-11. This was despite Milks knowing that (1) Plaintiff denied K.S.'s allegations; (2) K.S. provided inconsistent statements about what occurred; (3) there was a purported CPS history between Plaintiff and K.S.; (4) and there might have been additional adults who could confirm or deny K.S.'s allegations.

Then, in April 2020, once Milks requested and received additional CPS records based on Plaintiff's counsel's prompting, Milks learned that R.O. said K.S. "lies and makes things up," K.S. admitted that "not everything she said was the truth" about previous unfounded reports, K.S.'s

principal said the school has issues with K.S. not being truthful, K.S. admitted that she lied about Plaintiff slapping her, and K.S. told a social worker that Plaintiff "only yells and never hurts." *See* Sealed Dkt. No. 85-20 at 5-7.  There was also a notation in the indicated records produced to Milks that there was a "CPS HX" which included an unfounded report of physical abuse in February 2013 and an unfounded report in May of 2010.  *See id.* at 8.  Despite, learning this information, there is no evidence that Milks did anything concerning Plaintiff's case until she left the office in late January of 2021.  *See* Dkt. No. 114-1 at ¶ 318.

However, none of this matters because Milks is entitled to prosecutorial immunity for her continued prosecution of Plaintiff.  The Second Circuit has acknowledged that "§ 1983 itself does not mention absolute prosecutorial immunity (or, for that matter, any immunity).  It is a judicially created doctrine that has developed over time."  *Anilao*, 27 F.4th at 864 n.4.  Nevertheless, prosecutorial immunity applies to a prosecutor's preparation for trial and there is only "[a] narrow limitation to the scope of absolute immunity in § 1983 actions . . . where the defect is jurisdictional—that is, where the prosecutor acted well outside the scope of authority, rather than where the defect relates, . . . to the prosecutor's motivation or the reasonableness of his official action."  *Id.* at 864.  "The jurisdictional defect must be clear and obvious."  *Id.*  The Second Circuit recognized "'that sometimes such immunity deprives a plaintiff of compensation that [she] undoubtedly merits.'"  *Id.* at 870 (quoting *Van de Kamp v. Goldstein*, 555 U.S. 335, 348 (2009)).  This is true, "'[e]specially in cases, such as the present one, in which a plaintiff plausibly alleges disgraceful behavior by district attorneys, the application of this doctrine is more than disquieting.'"  *Id.* (quoting *Pinaud v. County of Suffolk*, 52 F.3d 1139, 1147 (2d Cir. 1995)).

The Court has been unable to find a case in which a prosecutor has been held liable for failing to dismiss charges or seek a defendant's release from incarceration upon the dissipation of

probable cause. This is likely because, under the judicially created absolute immunity doctrine, any actions taken by a prosecutor after the initiation of a criminal proceeding that was initially supported by probable cause, are protected. Whether that is always appropriate and whether prosecutorial immunity is sometimes extended too far is not a question this Court can answer. Rather, this Court is tasked with determining only whether, based on the body of case law that presently exists, Defendant Milks is entitled to absolute prosecutorial immunity for her conduct. Bound by Supreme Court and Second Circuit precedent, the Court concludes that she is.

The Broome County Defendants' motion is granted as to Plaintiff's malicious prosecution claim against Defendant Milks.

### 6. Failure to Intervene

The Endicott Defendants argue that McEwan cannot be held liable for failure to intervene because Plaintiff seeks to hold McEwan liable for a substantive offense and because he did not have any authority to intervene in Milks' actions. *See* Dkt. No. 85-36 at 40. Plaintiff argues that McEwan should have intervened by preventing Milks from presenting the case to the grand jury because McEwan knew information that challenged K.S.'s allegations. *See* Dkt. No. 108-1 at 32-33.

"Police officers have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Cornell v. Vill. of Clayton*, 691 F. Supp. 3d 608, 620 (N.D.N.Y. 2023) (quoting *Martinez v. City of New York*, 564 F. Supp. 3d 88, 106 (E.D.N.Y. 2021)) (additional quotation and quotation marks omitted). "'Liability attaches on the theory that the officer, by failing to intervene, becomes a "tacit collaborator" in the illegality.'" *Id.* (quoting *Smith v. Sawyer*, 435 F. Supp. 3d 417, 438 (N.D.N.Y. 2020)). "To succeed on a failure to intervene claim, a plaintiff must demonstrate that: (1) the

65

defendant had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the defendant's position would have known that the plaintiff's constitutional rights were being violated; and (3) the defendant did not take reasonable steps to intervene." *Id.* (quoting *Wagner v. Hyra*, 662 F. Supp. 3d 274, 285-86, (N.D.N.Y. Mar. 16, 2023)). "'[T]he officer faulted for failing to intervene must have had "a realistic opportunity to intervene to prevent the harm from occurring."'" *Id.* (quoting *Martinez*, 564 F. Supp. 3d at 106) (additional quotation omitted).

"'Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.'" *Id.* (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)); *see also Aguirre v. City of New York*, No. 15-CV-6043, 2017 WL 4236552, *12 (E.D.N.Y. Sept. 22, 2017); *Taylor v. City of New York*, No. 19-CV-6754, 2022 WL 744037, *23 (S.D.N.Y. Mar. 11, 2022); *Herman v. City of New York*, No. 15-CV-3059, 2022 WL 900592, *15 (E.D.N.Y. Mar. 28, 2022).

Here, McEwan ceased involvement in Plaintiff's criminal case on March 13, 2020, when Milks informed him there would be no *Huntley* hearing. *See* Dkt. No. 114-1 at ¶¶ 311-12. McEwan never obtained any indicated or unfounded CPS reports. He did not know Milks requested the CPS records in April 2020. There is absolutely no evidence to suggest that McEwan was in "constructive possession" of the unfounded records because all of the testimony indicates that McEwan was not allowed to receive unfounded records. *See* Dkt. No. 85-15 at 12-23, Dkt. No. 85-24 at 57-62. Although McEwan testified that he has been on the MDT in some cases, there is nothing in the record to suggest that he was a part of the MDT in Plaintiff's case or that he was permitted to request, or would have received, unfounded CPS records.

Based on the foregoing, Plaintiff has not raised a genuine dispute of fact concerning McEwan's ability to intervene in Milks' conduct. This aspect of the Endicott Defendants' motion is granted.

### 7. Brady Violation Claim

In Plaintiff's complaint, he alleges a due process violation based, in part, on "the withholding of exculpatory evidence by government officers and agents acting in investigatory capacities . . . ." Dkt. No. 1 at ¶ 256. The Defendants construe this as a *Brady* claim. *See* Dkt. No. 85-36 at 12; Dkt. No. 94-30 at 29.

"It is well-established by Brady and related authorities that in a criminal prosecution, 'the government has an affirmative duty' under the Due Process Clause 'to disclose favorable evidence known to it, even if no specific disclosure request is made by the defense.' If this obligation is violated, the district court may grant a new trial." *United States v. Hunter*, 32 F.4th 22, 30-31 (2d Cir. 2022) (footnote omitted). "That said, not all instances of governmental nondisclosure violate *Brady*, or warrant such relief." *Id.* (footnote omitted). "'There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'" *Id.* at 30-31 (footnote omitted). "In other words, true *Brady* material must be (1) favorable, (2) suppressed, and (3) prejudicial." *Id.* at 31.

Plaintiff argues that "[i]n no uncertain terms, the prior unfounded reports between K.S. and Plaintiff were *Brady* material that all Parties can agree was never disclosed to Plaintiff during this prosecution." Dkt. No. 108-1 at 17. As to McEwan, Plaintiff states that McEwan was in constructive possession of the Broome County Social Services records demonstrating K.S.'s

history of providing false statements.  *See id.* at 16-17.  Plaintiff cites New York Social Services Law § 422 (5)(a)(iii) which states that "unfounded reports may only be unsealed and made available" as follows:

> to a local child protective service, the office of children and family services, or all members of a local or regional multidisciplinary investigative team or the justice center for the protection of people with special needs when investigating a subsequent report of suspected abuse, neglect or maltreatment involving a subject of the unfounded report, a child named in the unfounded report, or a child's sibling named in the unfounded report pursuant to this article or article eleven of this chapter . . . .

N.Y. Soc. Serv. L. § 422(5)(a)(iii).  Plaintiff asserts that McEwan was a "member[] of a local or regional multidisciplinary investigative team"; therefore, he had constructive possession of the unfounded reports.  *Id.*; *see also* Dkt. No. 108-1 at 17.  Plaintiff does not present any case law concerning whether a police officer's potential ability to obtain information which he or she did not obtain, would constitute *Brady* evidence.  *See* Dkt. No. 108-1 at 16-17.

"The Supreme Court in *Kyles v. Whitley* explained that *Brady* material is suppressed where the prosecution (1) introduces testimony that it knows, or should know, is perjury; (2) does not honor a defense request for specific exculpatory evidence; or (3) fails to volunteer exculpatory evidence not requested by the defense, or requested only generally."  *Parker v. Herbert*, No. 02-CV-0373, 2009 WL 2971575, *40 (W.D.N.Y. May 28, 2009) (citing *Kyles v. Whitley*, 514 U.S. 419 (1995)).  "[S]uppression of evidence may occur where the state prosecutor has actual possession or knowledge of the evidence and fails to disclose it to the defense."  *Id.*  "'[T]he individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police.'"  *Id.* at 41 (quoting *Kyles*, 514 U.S. at 437) (additional citation omitted).  "Thus, it is well-settled that suppression of evidence may also occur

68

if the prosecutor has only 'constructive knowledge' of the *Brady* material's existence." *Id.* (quoting *United States v. Coppa*, 267 F.3d 132, 140 (2d Cir. 2001)).

However, "[t]he government does not have a duty to seek out this sort of evidence not in its possession or constructive possession." *Orena v. United States*, 956 F. Supp. 1071, 1090 (E.D.N.Y. 1997); *see also Chandras v. McGinnis*, No. 01-CV-2519, 2002 WL 31946711, *8 (E.D.N.Y. Nov. 13, 2002) ("*Brady* does not require the prosecution to seek out exculpatory or impeachment evidence within the possession of *all* government agencies"). The Second Circuit has stated that it is a "completely untenable position that 'knowledge of any part of the government is equivalent to knowledge on the part of this prosecutor.'" *Id.* "Thus, for example, the Second Circuit held that state prosecutors did not have constructive knowledge of exculpatory information in a parole officer's report. . . . The Second Circuit (and other courts) also have not required federal prosecutors to learn about evidence possessed by state governments or other federal agencies that are not involved in the investigation of the particular defendants." *Chandras*, 2002 WL 31946711, at *8 (citing, *inter alia*, *Pina v. Henderson*, 752 F.2d 47, 49-50 (2d Cir. 1985)).

During his deposition, McEwan explained that the Broome County Child Advocacy MDT "is a team made up of different members of like law enforcement and . . . DSS." Dkt. No. 85-9 at 13. He stated that he was a member of the MDT "[a]t certain times[,]" but he does not "have access to CPS unfounded reports." *Id.* at 13, 62.

Mr. Shultz testified that, to his knowledge, no unfounded records were produced to the Endicott Police Department in Plaintiff's case. *See* Dkt. No. 85-15 at 15, 27. However, Mr. Schultz stated that a law enforcement agency could request records under "specific statutory criteria," including, in part, "certifying that they're law enforcement, that they're conducting an

investigation of this named individual and they need those records." *Id.* at 36.  Mr. Williams

confirmed that over the course of his career as a police officer, he had requested records from

CPS.  *See* Dkt. No. 85-24 at 56.  He explained he had to go through the District Attorney's Office

to request the records.  *See id.*  He never received unfounded CPS reports.  *See id.* at 60-61.

Plaintiff admits that McEwan did not have actual knowledge of the unfounded reports.

*See* Dkt. No. 114-1 at ¶¶ 165-67.  When Milks requested additional records in April of 2020,

McEwan was no longer involved in the case.  *See* Dkt. No. 114-1 at ¶¶ 311-14.  As to constructive

knowledge, McEwan and Williams testified that they could not receive unfounded reports, but §

422 indicates that they could if they were members of the MDT in a case.  *See* N.Y. Soc. Serv. L.

§ 422(5)(a)(iii); *see also* Dkt. No. 85-24 at 57-62, 85-9 at 62.  Shultz also testified that police

officers could request the records in a similar fashion as district attorneys.  *See* Dkt. No. 85-15 at

12-23.  However, this does not establish that McEwan had constructive knowledge that

unfounded CPS records existed.

"Suppression, for *Brady* purposes, happens only when prosecutors and police fail to

disclose evidence not otherwise available to a reasonably diligent defendant." *Jardine v.*

*Dittmann*, 658 F.3d 772, 776 (7th Cir. 2011); *see also United States v. Rowland*, No. 3:14-CR-79,

2015 WL 1190118, *2 (D. Conn. Mar. 16, 2015), *aff'd*, 826 F.3d 100 (2d Cir. 2016) ("'Evidence is

not considered to have been suppressed within the meaning of the *Brady* doctrine if the defendant

or his attorney either knew, or should have known, of the essential facts permitting him to take

advantage of that evidence'") (quoting *United States v. Paulino*, 445 F.3d 211, 225 (2d Cir.

2006)).

As acknowledged by Defendants, unfounded records can be unsealed and provided "to the

subject of the report." N.Y. Soc. Serv. L. § 422(5)(a)(iv).  Plaintiff was the subject of some of the

unfounded reports.  Additionally, "'*Brady* . . . does not require the government to act as a private investigator and valet for the defendant, gathering evidence and delivering it to opposing counsel.'"  *United States v. Meregildo*, 920 F. Supp. 2d 434, 445 (S.D.N.Y. 2013), *aff'd sub nom. United States v. Pierce*, 785 F.3d 832 (2d Cir. 2015) (quoting *United States v. Tadros*, 310 F.3d 999, 1005 (7th Cir. 2002)).  "[W]hile *Brady* is a remedial rule, there is no remedy for a defendant who possesses or has access to the information he claims was withheld."  *Id.*; *see also United States v. Avenatti*, No. 19-CR-374, 2022 WL 457315, *12 (S.D.N.Y. Feb. 15, 2022) ("But *Brady* does not require the Government to 'acquire' evidence or information from others").

Therefore, as to McEwan, there is no dispute that he did not have the unfounded reports in his actual or constructive possession sufficient to bring a *Brady* claim where there is no duty for McEwan to seek out additional evidence, especially evidence that the criminal defendant can himself obtain.  To the extent Plaintiff relies on Ames' statement to McEwan that Plaintiff and K.S. had a history with CPS, this does not establish that McEwan obtained evidence that he failed to produce to Plaintiff.  *See* Dkt. No. 108-1 at 16-17.

Regardless, *Brady* "disclosure *prior to trial* is not mandated."  *Leka v. Portuondo*, 257 F.3d 89, 100 (2d Cir. 2001) (emphasis added).  "Many cases discussing the *Brady* rule support Defendants' position that *Brady* is concerned only with the reliability of a conviction of a criminal defendant.  Though the Supreme Court and Second Circuit have not had occasion to examine a case in which an acquitted defendant sought vindication of his or her *Brady* rights in a Section 1983 action, their opinions have often used language suggesting that *Brady* does not extend to such a situation."  *Ambrose v. City of New York*, 623 F. Supp. 2d 454, 468 (S.D.N.Y. 2009). "Most courts that have directly considered the question have held that an acquittal extinguishes a Section 1983 plaintiff's due process claim for nondisclosure of *Brady* material."  *Id.* at 469

(collecting cases); *see also McClean v. Cnty. of Westchester*, No. 17-CV-4492, 2018 WL 6329420, *18 (S.D.N.Y. Dec. 3, 2018), *aff'd sub nom. McClean v. City of Mount Vernon*, 776 Fed. Appx. 725 (2d Cir. 2019) ("Courts have categorically rejected denial of a right to fair trial claims based on Brady violations where the plaintiff was not convicted in the underlying criminal trial") (collecting cases).

Plaintiff has not provided any legal authority stating the contrary. *See* Dkt. No. 108-1 at 15-19; Dkt. No. 107-1 at 25-27. Plaintiff asserts, with the following emphasis, that "[a] § 1983 plaintiff proceeding on a *Brady* theory can succeed on his claim if, **had the withheld information been disclosed prior to trial**, he would have been acquitted based on reasonable doubt or convicted on a lesser charge." Dkt. No. 107-1 at 25 (quoting *Bellamy v. City of New York*, 914 F.3d 727, 751 (2d Cir. 2019)); *see also* Dkt. No. 108-1 at 16. However, there was no trial in Plaintiff's case. Likewise, there is no indication in the record that the allegedly withheld evidence would have resulted in an acquittal or a conviction on a lesser charge because Plaintiff was not convicted. The Second Circuit has explained the Government's *Brady* "obligation to make such disclosures is pertinent not only to an accused's preparation for trial but also to his determination of whether or not to plead guilty. The defendant is entitled to make that decision with full awareness of favorable material evidence known to the government." *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998). Plaintiff was not required to plead guilty or go to trial. Therefore, the purpose of *Brady*'s requirements was not triggered, and *Brady* claim fails as a matter of law. The Defendants' motions are granted in this regard.

### 8. Excessive Force

Plaintiff alleges that Defendant Pomeroy physically assaulted Plaintiff while he was housed at BCJ and being transported from his dorm to the medical unit. Specifically, Plaintiff

alleges that Pomeroy used harassing language, punched Plaintiff, and required Plaintiff to insert his finger is to his anus and then mouth.  *See* Dkt. No. 1 at ¶¶ 212-21.  The Broome County Defendants argue that "no allegations are made of Defendant Pomeroy that would indicate that the Defendant Pomeroy did anything more than cause Plaintiff discomfort during normal and approved procedures."  Dkt. No. 94-30 at 38-39.  The parties also disagree about whether Plaintiff suffered any injuries.  Plaintiff contends that "in March 2019, shortly before his incarceration," he underwent an MRI "which showed no significant injury to his spine."  Dkt. No. 113-4 at ¶ 135.  He asserts that "[f]ollowing the beatings, Brown underwent an MRI on his back while incarcerated at the BCJ which showed four herniated disks."  *Id.* at ¶ 137.  Plaintiff alleges that after being released from incarceration, he "sought treatment for back injuries, eye injuries, mood disorders, anal infections, and complex post-traumatic stress disorder."  *Id.* at ¶ 138.

The Broome County Defendants argue that Plaintiff's contentions misstate the record because the 2019 MRI shows "subtle focal protrusion[s]" and he "suffered from pre-existing degenerative back issues."  *Id.* at ¶¶ 136-37.  They also "suggest that the record is far too thin to be considered 'treatment.'"  *Id.* at ¶ 138.  In a declaration, Pomeroy denies all of Plaintiff's allegations.  *See* Dkt. No. 94-29.

In their motion, the Broome County Defendants argue that Plaintiff has failed to state a claim against Pomeroy.  *See* Dkt. No. 94-30 at 38-39.  However, as Plaintiff points out, the failure to state a claim standard that is applicable to a motion to dismiss in not the appropriate test at this juncture.  *See* Dkt. No. 1078-1 at 31-32.  The Broome County Defendants label their motion as a "Motion to dismiss pursuant to FRCP 12(B)(6) and for summary judgment pursuant to FRCP 56(a)."  Dkt. No. 94-30 at 1.  They argue that "Plaintiff's complaint does not give rise to any genuine issue of material fact."  *Id.* at 11.  They also state, in part, that "Defendants BCJ should be

granted summary judgment because Plaintiff failed to exhaust administrative remedies, Plaintiff fails to state a cause of action for which relief may be granted and Defendants are entitled to qualified immunity." *Id.* at 12. The Broome County Defendants seemingly conflate the standards applicable to reviewing a motion to dismiss and a motion for summary judgment.

Here, the Broome County Defendants never made a pre-answer motion to dismiss the complaint. *See* Dkt. Nos. 7-11. The discovery deadline expired two months before the Broome County Defendants filed their motion, *see* Dkt. Nos. 76, 84, and the parties rely on documents outside of Plaintiff's complaint to support their respective arguments. *See, e.g.*, Dkt. No. 113-4 at ¶¶ 3, 6, 27, 30, 53, 81, 83. As such, the appropriate standard under which the Court will consider the Broome County Defendants' arguments is the summary judgment standard. *See Kennedy v. Hirsch*, No. 21-3155, 2023 WL 2564026, *2 (2d Cir. Mar. 20, 2023) (comparing *Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 52 (2d Cir. 2016) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face"), *with D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998) ("[S]ummary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law")).

As relevant to Plaintiff's claim against Pomeroy, "'[t]he Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment.'" *Frost v. New York City Police Dep't*, 980 F.3d 231, 251 (2d Cir. 2020) (quoting *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989)). "An officer's actions can amount to punishment if they are taken with 'an expressed intent to punish.'" *Id.* at 252 (quoting *Bell v. Wolfish*, 441 U.S. 520, 538 (1979)). "But even 'in the absence of an expressed intent to punish, a pretrial detainee can nevertheless prevail by showing that the actions are not rationally related to a legitimate nonpunitive governmental

purpose or that the actions appear excessive in relation to that purpose.'" *Id.* (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015)).

"[T]he standard used to evaluate an excessive force claim brought by a pretrial detainee under the Due Process Clause of the Fourteenth Amendment is broadly similar to the standard applied in the context of an excessive force claim brought by an arrestee under the Fourth Amendment." *LaFever v. Clarke*, 525 F. Supp. 3d 305, 334 (N.D.N.Y. 2021). "This standard should be applied 'from the perspective and with the knowledge of the defendant officer[.]'" *Frost*, 980 F.3d at 252. The Court must consider factors such as "'the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting[.]'" *Id.* (quotation omitted). "The factfinder must also 'take account of the legitimate interests in managing a jail, acknowledging as part of the objective reasonableness analysis that deference to policies and practices needed to maintain order and institutional security is appropriate.'" *Id.* (quotation omitted).

Plaintiff has presented sufficient allegations and supporting evidence to raise a genuine dispute of material fact as to whether Pomeroy used force on Plaintiff for no legitimate reason. Both parties argue that the video footage from BCJ supports their respective arguments. They are both correct.

The video reflects two time periods: 9:40 AM to 9:56 AM and 10:08 AM to 10:14 AM. The Broome County Defendants contend that the video from 9:56 AM to 10:08 AM is not "missing," because "[v]ideo is available while officers were interacting with Plaintiff and Plaintiff

fails to cite what, if any camera, and at what time the purported proposition took place." Dkt. No. 113-4 at ¶ 134.

Plaintiff asserts that after he was placed in handcuffs, Pomeroy "hit [Plaintiff's] head off the wall three – three good times." Dkt. No. 94-1 at 18. Then, when he was put in an intake cell, the handcuffs were taken off Plaintiff, Pomeroy put on white gloves, Pomeroy hit Plaintiff in the eye, and Pomeroy pushed Plaintiff's head into the wall. *See id.* at 19-20. About five to fifteen minutes passed while Plaintiff was alone in the intake cell. Then, Pomeroy came back in and punched Plaintiff again in the eye, handcuffed Plaintiff, and escorted Plaintiff to medical. *See id.* at 21-22. It was in the medical unit that Pomeroy allegedly made Plaintiff remove all of his clothes, bend over, and insert his finger into his anus and then mouth. *See id.* at 23.

The Broome County Defendants are correct that the video footage does not show any physical abuse of Plaintiff. Also, because the footage does not contain audio, no verbal abuse can be heard. However, the video footage follows Plaintiff's alleged timeline and does not necessarily exonerate Pomeroy of any wrongdoing. For example, the video shows Plaintiff being handcuffed by a corrections officer. The camera angle at which this can be seen is from across Plaintiff's dorm. The camera that was closest to Plaintiff does not show him being handcuffed because he is being handcuffed directly below that camera. At approximately 9:50:57 AM, Plaintiff and the officer can be seen swiftly moving backwards and then forwards, pushing Plaintiff into the wall. Two female corrections officers who were standing a few feet back are seen jolting forward. It is unclear whether Plaintiff was pushed into the wall three times, as he testifies, or if he was resisting and the corrections officer pinned him to the wall to ensure compliance. Pomeroy declares that no force whatsoever was used on Plaintiff. *See* Dkt. No. 94-29.

The video next shows, numerous corrections officers walking around intake. Plaintiff is never seen in the intake room. A box can be seen sitting on a desk, next to a monitor, which would appear to hold tissues, gloves, or face masks. The video is not clear. The video ends at 9:56:58 AM. The second video begins at 10:08:03 AM. It begins with the corrections officers taking Plaintiff out of the intake cell and transporting him to the medical unit. Therefore, there is no video of the time Plaintiff was sitting in the intake cell, during which time he testified Pomeroy put on gloves and punched Plaintiff. *See* Dkt. No. 94-1 at 18-22. Even if video footage of the missing ten minutes had been provided, it is unlikely the Court would have been able to view inside Plaintiff's intake cell because no camera angles were provided to the Court which showed inside that cell. When the video resumed for the second period of time, the box that was originally sitting next to the computer monitor was in a different location. At 10:09:38 AM, a female correction officer moved the box back to its original location.

As depicted in the second video, once Plaintiff was placed in a cell in the medical unit, he took off all of his clothes. It appears that Plaintiff may have bent over at one point. There are multiple corrections officers standing between the camera's view and Plaintiff's body. The video is also quite blurry. At the end of the video, all of the corrections officers leave the cell and Plaintiff is naked. The Court was unable to see whether Plaintiff did, in fact, bend over and insert his fingers into his anus and mouth.

Because the video footage does not contain audio nor does it depict every interaction between Pomeroy and Plaintiff from the time Plaintiff was removed from his dorm and placed into a medical cell, the Court must rely on Plaintiff's and Pomeroy's sworn statements. Plaintiff detailed, under oath, what he contends Pomeroy did. *See* Dkt. No. 94-1 at 18-22. His testimony

corroborates his complaint.  *See* Dkt. No. 1 at ¶¶ 209-22.  Pomeroy denies all of Plaintiff's

allegations in a sworn declaration.  *See* Dkt. No. 94-29.

A corrections officer punching a pre-trial detainee and pushing his head into a cement wall

for no legitimate purpose can constitute excessive force.  However, whether Pomeroy used

excessive force without a legitimate purpose is a question of fact that turns largely on Plaintiff

and Pomeroy's credibility.  *See Ali v. Szabo*, 81 F. Supp. 2d 447, 457 (S.D.N.Y. 2000) (denying

summary judgment on excessive force claim because "the Court assumes for purposes of this

motion that [the plaintiff] was obeying the order to return to his cell when the incident occurred. It

is therefore unclear whether there was any need for the application of force, and whether [the

o]fficers . . . 'attacked' and 'slammed' [the plaintiff] sadistically and without provocation").

Therefore, this aspect of the Broome County Defendants' motion must be denied.[7]

### 9. Qualified Immunity

"Qualified immunity establishes a defense for a government actor acting in his official

capacity. . . .  It 'provides ample protection to all but the plainly incompetent or those who

knowingly violate the law.'"  *Dufort v. City of New York*, 874 F.3d 338, 354 (2d Cir. 2017)

(quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Because the Court concluded that (1) there was probable cause to support Plaintiff's initial

arrest, prosecution, and imprisonment; (2) Defendant Milks is entitled to absolute prosecutorial

immunity for seeking a grand jury indictment and subsequent conduct; and (3) McEwan was not

---

[7] The Court comes to this conclusion regardless of Plaintiff's alleged injuries or lack thereof.  This is because "[e]ven without serious injuries, a defendant's actions could still constitute excessive force because the use of entirely gratuitous force [could be] unreasonable and therefore excessive."  *Kirton v. Doe*, No. 20-CV-10860, 2023 WL 2586279, *5 (S.D.N.Y. Mar. 21, 2023) (quoting *Banks v. Cnty. of Westchester*, 168 F. Supp. 3d 682, 690 (S.D.N.Y. 2016)) (additional quotation marks omitted).

personally involved in Plaintiff's case after his arrest and imprisonment, the Court need not address qualified immunity as it relates to Plaintiff's Fourth Amendment claims.

As to Plaintiff's excessive force claim, "[a] plaintiff can prevail against a qualified immunity defense by raising a genuine issue of material fact as to whether the officers' conduct violated clearly established law and as to whether 'officers of reasonable competence could disagree on the legality of the defendant[s'] actions.'" *Usavage v. Port Auth. of New York & New Jersey*, 932 F. Supp. 2d 575, 593 (S.D.N.Y. 2013) (collecting cases which denied summary judgment because resolution of the qualified immunity issue was dependent on a credibility determination). "'It is well established that qualified immunity may operate as a defense to excessive force claims.'" *Id.* (quoting *Mesa v. City of New York*, No. 09-CV-10464, 2013 WL 31002, *18 (S.D.N.Y. Jan. 3, 2013)). "By the same token, '[i]t is beyond dispute that the right to be free from excessive force has long been clearly established.'" *Id.* (*quoting Green v. Montgomery*, 219 F.3d 52, 59 (2d Cir. 2000)).

Because there are factual disputes about whether Pomeroy hit Plaintiff and, if so, whether there was any legitimate justification for such action, the Court cannot conclude as a matter of law whether Pomeroy is entitled to qualified immunity. Therefore, the Broome County Defendants' motion is denied on this issue.

### 10. Municipal and Supervisory Liability

"Under the Supreme Court's decision in *Monell v. Department of Social Services of the City of New York*, 'a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents.'" *Diop v. City of New York*, 50 F. Supp. 3d 411, 425 (S.D.N.Y. 2014) (quoting *Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658, 694 (1978)). "'Instead, it is when execution of a government's policy or custom . . . inflicts the injury that the government

as an entity is responsible under § 1983.'"  *Id.* (quotation omitted).  "Thus, '[t]o hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right.'"  *Id.* (quoting *Torraco v. Port Auth. of N.Y. & N.J.*, 615 F.3d 129, 140 (2d Cir. 2010)).  A plaintiff may demonstrate a policy or custom exists by showing one the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Jones v. Westchester County*, 182 F. Supp. 3d 134, 158 (S.D.N.Y. 2016).

Likewise, "'[a] supervisor may not be held liable under section 1983 merely because his subordinate committed a constitutional tort.'"  *Zielinski v. Annucci*, 547 F. Supp. 3d 227, 237 (N.D.N.Y. 2021) (quoting *Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir. 2002)).  "Instead, a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'"  *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)).  "The focus is on what the *supervisor* did or caused to be done, 'the resulting injury attributable to his conduct, and the *mens rea* required of him to be held liable which can be no less than the *mens rea* required of anyone else.   Simply put, there's no special rule of liability for supervisors.'"  *Id.* (quoting *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020)).

As to the Broome County Defendants, Plaintiff argues that Cornwell, the Broome County District Attorney, and Howard Schultz, the General Counsel for Broome County Social Services, are final policy makers whose conduct violated Plaintiff's constitutional rights. *See* Dkt. No. 107-1 at 51. He contends that "Broome County, under Schultz's direction, operated with a deliberate indifference to the constitutional rights of those investigated and prosecuted by Broome County, warranting the attachment of *Monell* liability." *Id.* at 55. Plaintiff also asserts that "the gross supervisory failure by Sheriff Harder" permitted constitutional violations. *Id.* at 44. As to the Endicott Defendants, Plaintiff argues that the Village of Endicott failed to properly train McEwan which resulted in McEwan failing to obtain the unfounded CPS reports. *See* Dkt. No. 108-1 at 38-39.

As to Cornwell, Plaintiff's arguments are entirely conclusory. Plaintiff asserts that because Cornwell instituted a policy requiring prosecutors to present evidence to a grand jury that met the standard of beyond a reasonable doubt, which was higher than the previous policy requiring evidence establishing only probable cause, "while ostensibly sound on its face, exerted significant pressure on young and ambitious ADAs, eager to make a name for themselves." Dkt. No. 107-1 at 52. Because Cornwell did not conduct a formal training to discuss this change, Plaintiff contends that "[t]his hands-off approach fostered an environment ripe for misconduct, where prosecutors like Milks could pursue baseless cases under the misguided belief that they were acting within the bounds of the law." *Id.* at 53.

First, the Court has already concluded that Cornwell is entitled to absolute immunity such that the claims against Cornwell cannot proceed. Second, even if absolute immunity did not bar Plaintiff's claim, Plaintiff has failed to present any evidence that Cornwell's conduct in promulgating a beyond a reasonable doubt standard for grand jury presentment resulted in a

constitutional violation. Therefore, the Broome County Defendants' motion on this issue and as

to Defendant Cornwell is granted.

Second, Plaintiff sets forth no viable argument concerning Defendant Harder's conduct

which could permit the claims against Harder to proceed. Plaintiff's entire argument concerning

Harder's role in the case states that "the gross supervisory failures by Sheriff Harder and DA

Cornwell that allowed this misconduct to flourish, each defendant played a direct and integral role

in the violations suffered by Brown." Dkt. No. 107-1 at 44. A defendant cannot be held liable

solely because he or she is a supervisor of other defendants without evidence of the defendant's

participation in the constitutional violation. *See Balkanli v. Renzo*, No. 24-CV-7166, 2024 WL

4753295, *2 (E.D.N.Y. Nov. 12, 2024) ("Liability under § 1983 cannot be generally imposed on a

supervisor solely based on her position because there is no *respondeat superior* or vicarious

liability under § 1983"). Because Plaintiff has not presented any evidence that Harder was

personally involved in any purported constitutional violation, the Broome County Defendants'

motion is granted in relation to Defendant Harder.

As to DSS General Counsel Schultz, Plaintiff argues that Schultz violated Plaintiff's

constitutional rights by failing to properly train DSS employees. *See* Dkt. No. 107-1 at 55.

Specifically, Plaintiff states that Schultz "trained his staff to only disclose prior unfounded DSS

reports under two circumstances, neither of which conformed with NY SSL 422(5)(a)(iii) and

which permitted access to unfounded reports to both Milks and McEwan." *Id.* Plaintiff notes that

Schultz testified during his deposition that unfounded reports would not be turned over, even

upon Court order. *See id.*

"'A general allegation that [a supervisor] failed to train subordinates . . . is insufficient to

establish personal involvement, absent some factual connection between their failure to train and

82

the harm that eventually befell Plaintiff.'" *Heyliger v. Krygier*, 335 F. Supp. 3d 482, 498 (W.D.N.Y. 2018) (quoting *Samuels v. Fischer*, 168 F. Supp. 3d 625, 639 (S.D.N.Y. 2016)). "The plaintiff must show that the defendant 'knew or should have known that there was a high degree of risk that his subordinates would behave inappropriately' and then 'deliberately or recklessly disregarded that risk by failing to take action that a reasonable supervisor would find necessary to prevent such a risk, and that failure caused a constitutional injury to Plaintiff.'" *Id.* (quoting *Frederick v. Sheahan*, No. 10-CV-6527, 2014 WL 3748587, at *8 (W.D.N.Y. July 29, 2014); *see also I.S. by & through Disla v. Binghamton City Sch. Dist.*, 486 F. Supp. 3d 575, 604 (N.D.N.Y. 2020) ("Showing merely that additional training would have been helpful in making difficult decisions does not establish municipal liability. . . . To show deliberate indifference, a plaintiff must allege facts plausibly suggesting that the defendant was on notice that, absent additional specified training, it was highly predictable that the defendant would be confounded by those gray areas and make incorrect decisions as a result") (alterations, quotations, and quotation marks omitted).

Plaintiff has not presented any evidence to establish that Schultz was aware that absent additional training on § 422, constitutional violations might occur. Schultz testified during his deposition that unfounded reports are legally sealed and can only be obtained by the subject of the report or an attorney prosecuting a false report. *See* Dkt. No. 85-15 at 20. He explained that DSS would not produce unfounded reports even upon court order unless the request was made by the subject of the report. *See id.* at 20-21. Schultz states that he had never seen an appeal taken from the denial of unfounded records. *See id.* at 21. He explained that the reason the undisclosed records were produced in this case was because Plaintiff, "the subject of the investigation[,] wanted the disclosure and authorized the disclosure." *Id.* at 22. Schultz testified that he was not

otherwise aware of any disclosure of unfounded sealed records by DSS outside the context of this case, false reporting cases, "[o]r [cases] the Social Services Department has been involved with." *Id.* at 22-23.

Later in his deposition, Schultz explained that an additional exception to the rule against produced unfounded records is that "the unfounded records can be disclosed to the Social Services Department. So, for example, and this is common, if an investigation is unfounded and then a period of time later there's another report to the New York State Central Registry, the Social Services Department is mandated to look at the prior unfounded sealed records as part of the history." *Id.* at 22-23. Schultz also testified that there are mandatory trainings for caseworkers. *See id.* at 42, 46-47.

Plaintiff argues that based on this testimony, "it is clear that Broome County, under Schultz's direction, operated with a deliberate indifference to the constitutional rights of those investigated and prosecuted by Broome County, warranting the attachment of Monell liability." Dkt. No. 107-1 at 55. The Court disagrees. There is no evidence in the record to suggest that Schultz was aware, or should have been aware of, a likelihood that constitutional violations would have occurred based on his knowledge and training concerning unfounded reports. There is no evidence in the record that such constitutional violations have ever occurred, and that Schultz turned a blind eye to such conduct or refused to conduct additional training to remedy the situation. Plaintiff's argument that because Schultz is general counsel for DSS, he is liable for Milks and McEwan failing to retrieve unfounded DSS reports, is meritless.

As to the Village of Endicott, the Endicott Defendants argue that Plaintiff has failed to establish municipal liability because the record does not contain any policy, practice, or custom from the Village. *See* Dkt. No. 85-36 at 46-48. Plaintiff summarily argues that Chief Williams'

and McEwan's testimony about not engaging in formal training about obtaining unfounded records demonstrates "an absolute failure to train on behalf of the Village of Endicott, and there is clearly a causal link between this failure to train and Plaintiff's prosecution and subsequent two years of incarceration." Dkt. No. 108-1 at 39.

"In *City of Canton, Ohio v. Harris*, the Supreme Court established that a municipality can be liable for failing to train its employees where it acts with deliberate indifference in disregarding the risk that its employees will unconstitutionally apply its policies without more training." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 129 (2d Cir. 2004) (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 387-90 (1989)). "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (quoting on *Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 409 (1997)). "Policymakers' 'continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the "deliberate indifference"—necessary to trigger municipal liability.'" *Id.* (quotation omitted). "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.*

Plaintiff has not presented any evidence that the Village of Endicott had any knowledge that its policies resulted in violations of anyone's constitutional rights. The same can be said for Broome County. Plaintiff argues that, as to application of New York Social Services Law § 422, the individual Defendants' conduct establishes municipal liability. *See* Dkt. No. 107-1 at 56. He notes that "[i]f a plaintiff can show that the actions of subordinate officers are sufficiently

widespread to constitute the constructive acquiescence of senior policymakers, liability attaches."

*Id.* (citation and emphasis omitted).  As to the individual Defendants involved in his state criminal

case, Plaintiff states as follows:

> Milks knew she was a member of the multidisciplinary team, as did
> Cornwell, and Detective McEwan.  All three were explicitly
> instructed by the General Counsel for BCDSS that they were not
> permitted access to unfounded reports, even if the reports were
> regarding subjects of a current criminal investigation.  The practice
> was so persistent and widespread and permanent that it would
> constitute a 'custom or usage' with the force of law, and thereby
> generate municipal liability.

*Id.*  The Court concludes that such allegations are insufficient to establish Broome County's

liability.

"A Section 1983 action may be maintained based on a practice that was so persistent or

widespread' as to constitute 'a custom or usage with the force of law." *Green v. City of New

York*, 465 F.3d 65, 80 (2d Cir. 2006) (quoting *Patterson v. County of Oneida*, 375 F.3d 206, 226

(2d Cir. 2004)) (additional quotation and quotation marks omitted).  "The alleged custom or

practice need not be embodied in a rule or regulation." *Id.* (citing *Kern v. City of Rochester*, 93

F.3d 38, 44 (2d Cir. 1996)).  "However, the alleged practice 'must be so manifest as to imply the

constructive acquiescence of senior policy-making officials.'" *Id.* (quotation omitted).  "In other

words, a plaintiff can show that there is 'a longstanding practice or custom which constitutes the

'standard operating procedure' of the local governmental entity.'" *McLennon v. City of New York*,

171 F. Supp. 3d 69, 95 (E.D.N.Y. 2016) (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701,

737 (1989)).

"'[I]solated acts . . . by non-policymaking municipal employees are generally not sufficient

to demonstrate a municipal custom, policy, or usage that would justify municipal liability.'" *Id.*

(quoting *Jones v. Town of E. Haven*, 691 F.3d 72, 81 (2d Cir.2012)).  "There is no set number of incidents that make a practice 'widespread,' and courts have found a wide range of instances insufficient to plausibly allege a municipal custom."  *Id.*  However, "[n]ormally, 'a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the [municipality].'"  *Freudenberg v. Cnty. of Orange*, No. 23-CV-847, 2024 WL 4307176, *9 (S.D.N.Y. Sept. 25, 2024) (quoting *Newton v. City of New York*, 566 F. Supp. 2d 256, 271 (S.D.N.Y. 2008)).

"To demonstrate a de facto policy or custom through a widespread practice, a plaintiff must 'show that the policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions.'"  *Id.* (quoting *Buari v. City of New York*, 530 F. Supp. 3d 356, 398 (S.D.N.Y. 2021)).  "A practice can constitute a custom under *Monell* when the practice is 'persistent and widespread,' or 'permanent and well settled as to constitute a "custom or usage" with the force of law' and to 'imply the constructive knowledge of policymaking officials.'"  *Id.* (quoting *In re N.Y.C. Policing During Summer 2020 Demonstrations*, 548 F. Supp. 3d 383, 400 (S.D.N.Y. 2021)).

Plaintiff does not argue that § 422 is unconstitutional.  He also does not contend that there was a formal, written policy concerning § 422's application.  Rather, he seeks to hold Broome County and Endicott Village liable for a a single instance where § 422 was allegedly inappropriately applied—his state criminal case.  A single instance of allegedly unconstitutional conduct cannot establish a widespread custom or usage of an unconstitutional policy.  Therefore, this aspect of the Endicott Defendants' and the Broome County Defendants' motions is granted.

### 11. State Law Claims

Defendants argue that, for the same reasons stated with respect to Plaintiff's federal claims, Plaintiff's state law malicious prosecution, false arrest, and assault and battery claims should be dismissed.  *See* Dkt. No. 94-30 at 40-43; Dkt. No. 85-36 at 51.

Because the Court has concluded that there are disputes of fact concerning Plaintiff's § 1983 excessive force claim, the Court concludes the same concerning Plaintiff's related state law claim.  Likewise, the Court grants summary judgment on Plaintiff's state false arrest, malicious prosecution, and failure to intervene claims for the same reasons previously set forth in this Memorandum-Decision and Order.  *See Lloyd v. City of New York*, 246 F. Supp. 3d 704, 729 (S.D.N.Y. 2017) (denying summary judgment on a state assault and battery claim where summary judgment was denied on equivalent Section 1983 excessive force claim); *Graham v. City of New York*, 928 F. Supp. 2d 610, 625 (E.D.N.Y. 2013) ("Since there are questions of fact regarding Plaintiff's excessive force claim, there are also questions of fact regarding Plaintiff's state law assault and battery claims"); *Frederique v. Cnty. of Nassau*, 168 F. Supp. 3d 455, 491 (E.D.N.Y. 2016) (dismissing state law false arrest, malicious prosecution, and abuse of process claims for the same reasons as their federal counterparts).

Therefore, the Broome County Defendants' motion is granted in part and denied in part on this issue.  The Endicott Defendants' motion is granted.

## IV. CONCLUSION

After careful review of the record, the parties' submissions, and the applicable law, the Court hereby

**ORDERS** that the Endicott Defendants' motion for summary judgment (Dkt. No. 85) is **GRANTED**; and the Court further

**ORDERS** that the Broome County Defendants' motion for summary judgment (Dkt. No. 94) is **GRANTED IN PART AND DENIED IN PART**; and the Court further

**ORDERS** that Defendants Village of Endicott, Broome County, Michael McEwan, Stephanie Milks, Michael Korchak, Stephen Cornwell, and David Harder, are **DISMISSED** from this action with prejudice; and the Court further

**ORDERS** that the excessive force claim against Defendant Sean Pomeroy and the corresponding state law claim shall proceed to trial; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated:  March 19, 2025
        Albany, New York

Mae A. D'Agostino
U.S. District Judge

89